J. NELSON THOMAS (admitted *pro hac vice*)
JONATHAN W. FERRIS (admitted *pro hac vice*)
MICHAEL J. LINGLE (admitted *pro hac vice*)
ANNETTE M. GIFFORD - 270777
THOMAS & SOLOMON LLP
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
Email:        nthomas@theemploymentattorneys.com
              jferris@theemploymentattorneys.com
              nthomas@theemploymentattorneys.com
              amgifford@gmail.com


SANFORD JAY ROSEN – 062566
VAN SWEARINGEN – 259809
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104
Email:        srosen@rbgg.com
              vswearingen@rbgg.com

Attorneys for
RELATOR GWEN THROWER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. GWEN THROWER,<br><br>                    Plaintiff,<br><br>          v.<br><br>ACADEMY MORTGAGE CORPORATION,<br><br>                    Defendant. | Case No. 16-CV-02120-EMC<br><br>**RELATOR'S SUPPLEMENTAL BRIEFING REQUESTED BY THE COURT DURING THE NOVEMBER 30, 2017 ORAL ARGUMENT**<br><br>Judge:  Hon. Edward M. Chen<br>Date:   To be determined<br>Time:   To be determined<br>Courtroom: 5, 17th Floor |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

PRETINENT FACTS AND PROCEDURES ............................................................ 2

       *The Original Complaint* ................................................................................ 2

       *The Decision to Decline.* ............................................................................. 3

       *Relator Files an Amended Complaint* ......................................................... 4

       *The Motion to Dismiss.* ............................................................................... 6

ARGUMENT ......................................................................................................... 12

    I.    There is no Dispute that the *Sequoia Orange* Standard Governs this
         Motion .................................................................................................. 12

    II.   *Sequoia Orange* Properly Relied on the FCA's Legislative History ............... 14

   III.  *Sequoia Orange* Test Controls over Contrary Tests Arising in Other
         Contexts ............................................................................................... 16

   IV.   Relator has met the Standard for a Hearing ................................................. 17

    V.   Relator will Demonstrate at the Evidentiary Hearing that the Government's
         Decision to Seek Dismissal was Arbitary Under *Sequoia Orange* ................. 20

         A. The Government Did Not Fully Investigate the Allegations .......... 20

         B. The Government Neglected Evidence ............................................. 22

         C. The Government Seeks to Dismiss the Case without
            Legitimate Reasons ................................................................... 23

         D. The Government Relied on an Improper Consideration in
            Moving to Dismiss ..................................................................... 24

         E. The Government's Provided Fraudulent Reasons for
            Seeking Dismissal ..................................................................... 25

         F. The Government's Motion to Dismiss is also Causing
            Undue Delay .............................................................................. 25

         G. The Government Acted Unreasonably in Light of all the
            Existing Evidence ...................................................................... 26

H.  Witness and Exhibits at the Evidentiary Hearing .........................28

CONCLUSION.................................................................................................30

RELATOR'S SUPPLEMENTAL BRIEF

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Arizona ex rel. Goddard v. Frito-Lay, Inc.*,
    273 F.R.D. 545 (D. Ariz. 2011) ...................................................................... 29

*Dunlop v. Bachowski*,
    421 U.S. 560 .................................................................................................. 17

*E. Bay Mun. Util. Dist. v. Balfour Beatty Infrastructure, Inc.*,
    No. 13-CV-02032-WHO, 2014 WL 2611312 (N.D. Cal. June 11, 2014) ........... 6

*Hecker v. Chaney*,
    470 U.S. 821 (1985), ............................................................................... 16, 17

*Lazy Y Ranch LTD v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) ....................................................................... 12

*Lockary v. Kayfetz*,
    917 F.2d 1150 (9th Cir. 1990) ..................................................................... 19

*Mateski v. Mateski*,
    634 Fed Appx. 192 (9th Cir. 2015) .................................................... 14, 15, 19

*Ridenour v. Kaiser-Hill Co., LLC*,
    397 F.3d 925 (10th Cir. 2005) ..................................................................... 15

*Rille v. PricewaterhouseCoopers LLP*,
    803 F.3d 368 (8th Cir. 2015) .......................................................................... 3

*Swift v. U.S.*,
    318 F.3d 250 (D.C. Cir. 2003) ..................................................................... 15

*U.S. ex rel. Kelly v. The Boeing Co.*,
    9 F.3d 743 (9th Cir. 1993) ........................................................................... 19

*U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*,
    972 F. Supp. 2d 1317 (N.D. Ga. 2013) ........................................................... 6

*U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*,
    151 F.3d 1139 (9th Cir. 1998) ............................................................... *passim*

*U.S. ex rel. Stewart v. Altech Servs., Inc.*,
    No. CV-07-0213, 2010 WL 4806829 (E.D. Wash. Nov. 18, 2010) .................... 6

*U.S. ex rel. Ubl v. IIF Data Sols.*, No. CIV.A. 1:06-CV-641,
    2009 WL 1254704 (E.D. Va. May 5, 2009) ...................................................... 6

*United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*,
    668 F.Supp.2d 780 (E.D. La. 2009) ................................................................. 6

*United States ex rel. Kolchinsky v. Moody's Corp.*,
    162 F. Supp. 3d 186, (S.D.N.Y. 2016) ........................................................................6

*United States ex rel. Milam v. Regents of Univ. of Cal.*,
    912 F.Supp. 868 (D. Md. 1995) ..................................................................................6

*United States ex rel. Mikes v. Straus*,
    931 F.Supp. 248 (S.D.N.Y. 1996) ..............................................................................6

*United States v. Armstrong*,
    48 F.3d 1508 (9th Cir. 1995) ....................................................................................16

*United States v. Redondo—Lemos*,
    955 F.2d 1296 (9th Cir.1992) ...................................................................................16

*Wisz ex rel. United States v. C/HAD Dev., Inc.*,
    31 F.Supp.2d 1068 (N.D. Ill. 1998) ...........................................................................6

*Younger Mfg. Co. v. Kaenon, Inc.*,
    247 F.R.D. 586 (C.D. Cal. 2007) .............................................................................29

**Rules & Regulations**

31 U.S.C. § 3130(c)(2)(A) .................................................................................................18

31 U.S.C. § 3730(b)(4)(A) .................................................................................................13

31 U.S.C. § 3730(c)(2) ........................................................................................................4,

31 U.S.C. § 3730(c)(2)(A) ....................................................................................13, 15, 19

31 U.S.C. § 3730(d)(1) and (2) ............................................................................................3

**Other Authorities**

Federal Rules of Civil Procedure 26(b)(1) or 26(c) ...........................................................7

24 C.F.R. § 15.204(a)(2)(vii) ..............................................................................................7

1986 U.S.C.C.A.N. 5266 ........................................................................................1, 13, 19

Qui Tam Provisions and the Public Interest: An Empirical Analysis,
    107 Colum. L. Rev. 949 (2007) ..................................................................................3

**PRELIMINARY STATEMENT**

The government does not have unfettered discretion to dismiss this action by meeting the rational basis test. Instead, under *U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir. 1998), which sets forth the governing law for this motion, the government must first establish that it has a valid government purpose for seeking dismissal and a rational relation between dismissal and that purpose. Even if the government makes that initial showing, the motion will still be denied if relator shows that the requested dismissal is based on "'fraudulent, arbitrary and capricious, or illegal'" reasons. *Id.* at 1145 (internal citations omitted). Those reasons include that the government: 1) did not fully investigate the allegations; 2) neglected evidence; 3) dropped the case without legitimate reasons; 4) acted arbitrarily or on improper considerations; 5) provided fraudulent reasons; 6) caused undue delay; or 7) acted unreasonably in light of all the existing evidence. *Id.* at 1144-45 (*citing* S.Rep. No. 99-345, at 25-26 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291). This test strikes the appropriate balance between prosecutorial discretion and Congressional commands to ensure that "suits are not dropped without legitimate government purpose." *Id.* at 1145. Indeed, governmental decisions about whether to prosecute an action should be made based on a full investigation of the facts and considering all of the evidence, not something less or based on the whim of a government decision-maker. When government decisions are based on less than full investigation of the facts and all of the evidence, or are based on something else, the decision is, at the very least, arbitrary.

In this brief, relator presents a colorable claim that the government's motion to dismiss fails the test and is therefore entitled to an evidentiary hearing. The evidence set forth below, including what relator expects to show at an evidentiary hearing, shows that the government failed to fully investigate the facts, neglected evidence, seeks dismissal without a legitimate reason, acted on improper considerations and/or for fraudulent reasons, is causing undue delay and acted unreasonably in light of all of the existing evidence.

Accordingly, the government's motion should be denied.

16-CV-02120-EMC

## PERTINENT FACTS AND PROCEDURE

### The Original Complaint

Relator filed her original complaint under seal on or about April 21, 2016.  The complaint spanned 33 pages and 167 paragraphs, detailing the various ways Academy Mortgage Corporation ("Academy"), one of the largest mortgage lenders in the country, engaged in a scheme of nationwide mortgage fraud.  *See* Docket No. 1. For example, the complaint alleged that Academy pressured underwriters to approve ineligible loans, *see* Docket No. 1, ¶¶ 96-105, manipulated data entered into the computer system in order to achieve approvals, *see* Docket No. 1, ¶¶ 106-115, deliberately miscalculated borrower's income, *see* Docket No. 1, ¶¶ 116-27, miscalculated borrower's debt obligations, *see* Docket No. 1, ¶¶ 128-36, failed to verify and obtain proper documentation of assets and down payments, *see* Docket No. 1, ¶¶ 137-44, hid adverse documentation that is excluded from FHA files, *see* Docket No. 1, ¶¶ 145-51, and ignored audit findings and failed to adopt proper quality control measures, *see* Docket No. 1, ¶¶ 152-59.  Relator completed service of her original complaint and written disclosures of material evidence to the government on or about July 25, 2016.

After reviewing the complaint and the written disclosures, on September 9, 2016, the United States requested an extension to make its intervention decision through March 23, 2017. *See* Docket No. 9.  In its request to the Court, the government outlined what it intended to do for its investigation. Those steps included: "assembling a team of investigators and attorneys from the U.S. Department of Justice, the U.S. Attorney's Office, and the U.S Department of Housing and Urban Development," interviewing the Relator, and then determining the plan for further investigation, which could include, "subpoenaing documents from the Defendant and identifying and interviewing additional witnesses." *See* Docket No. 9.

The government interviewed the Relator on or about October 14, 2016. However, other than that interview, the government has never indicated it conducted any further investigation into the claims and no such further investigation was the basis for the declination by the government. Despite having nearly three more months left in the investigatory period it requested, on or about December 28, 2016, the government filed its decision not to intervene, which it does in approximately 80% of

its cases,[1] and requested that the case be unsealed.  Docket No. 10.[2] By operation of the False Claims Act statute, as soon as the government declined to intervene, any potential monetary award to the relator from the settlement or proceeds of the action immediately increased from a 15-25% range, to a 25-30% range. 31 U.S.C. § 3730(d)(1) and (2).[3]

### The Decision to Decline

Although the complaint cited improper company-wide policies and practices stretching over years, the government confined its investigation to the relator interview.[4] While relator had also provided a list of witnesses to the government as part of her disclosures of her material evidence, the government apparently interviewed none of them. Based on the government's report, the government did not bother to conduct any other investigation on the defendant, either at the location the relator worked, or despite the allegations in the complaint, into company-wide policies or practices, or the time period during which those violations occurred. The government stated that it would be much more likely to intervene if the complaint had more detail on the nationwide

_____

[1] *See* Christina Orsini Broderick, Qui Tam Provisions and the Public Interest: An Empirical Analysis, 107 Colum. L. Rev. 949, 971 (2007) (between approximately 1986 and 2004, government intervened in approximately 22% of cases and declined to intervene in approximately 78% of cases).

[2] The government's investigation of approximately only a few months is also noteworthy in how short it was. According to a 2006 Government Accountability Office report "[c]ases in which DOJ intervened took a median of 38 months to conclude and ranged from 4 months to 187 months." Additionally, the United States' Attorneys' Office for the Northern District of California often takes several years before filing a notice of declination. *See e.g., U.S. ex rel. Hill v. Salamoni Trucking*, No. 3:12-cv-06268-JCS (N.D. Cal.) (complaint filed in December 2012; declination notice filed in August 2017); *U.S. ex rel. Murphy et al v. Actelion Ltd. et al.*, No. 10-cv-1402-EDL (N.D. Cal.) (complaint filed in April 2010; declination filed in August 2013); *U.S. ex rel. Reagan et al. v. MedTest Dx, Inc.*, No. 4:13-cv-02345-KAW (N.D. Cal.) (complaint filed in May 2013; declination filed in August 2016).

[3] Certainly, this would seem to incentivize the government to dismiss the case given that relator awards in these cases have frequently been millions, if not tens of millions of dollars.

[4] This limiting of the claims to only relator's location was improper as the relator would be entitled to a share of any recovery by the government, and would not be limited in just time and geographic scope of relator's employment. *See Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 373-74 (8th Cir. 2015) (relator entitled to share recovery for any government recovery in which "the conduct contemplated in the settlement agreement . . . overlaps with the conduct alleged in [the] Relator's complaint."). Thus, there was absolutely no reason for the government to limit its investigation to just the time period and region in which relator worked.

1    violations alleged in the complaint.

2          Despite declining, the government thought the allegations were strong enough that the

3    complaint did not warrant being dismissed. If the government had thought dismissal was

4    warranted—either because the complaint was not strong enough, or that a cost-benefit analysis made

5    the case not worth pursuing—it could have moved at that time to have the complaint dismissed

6    pursuant to 31 U.S.C. § 3730(c)(2). When relator informed the government on January 8, 2017 that

7    it would be pursuing the action, the government thanked the relator for the response, and forwarded

8    instructions and requests on working with the government and keeping it apprised of the litigation.

9          ***Relator Files an Amended Complaint***

10         Given the government's view that it wanted more detail in the complaint regarding the scope

11   of the nationwide violations (even though a complaint requires only notice pleading), relator's

12   counsel conducted interviews with individuals across the country, to provide additional support for

13   the allegations in the complaint. That effort culminated in the filing of an amended complaint on or

14   about April 27, 2017.  *See* Docket No. 45.

15         Like the original complaint, the amended complaint detailed Academy's nationwide scheme

16   of mortgage fraud. Not only did the amended complaint contain additional details of mortgage fraud

17   from the relator, but it also included detailed information supporting the company-wide fraudulent

18   policies and practices from 17 other employees of Academy. These employees and former managers

19   worked at approximately 14 of Academy's locations across the United States in Arizona, South

20   Carolina, Oregon, Florida, Texas, Colorado and Washington.

21         Additionally, the amended complaint compared Academy's terrible lending performance

22   with other lenders.  Academy's loans defaulted at significantly higher rates than comparable

23   mortgagors.  *See* Docket No. 45, ¶ 176.  Further, Academy's loans that resulted in insurance claims

24   or that were seriously delinquent in payment exceeded the national average of lenders at a

25   statistically significant level, which means that the probability that defendant's default record

26   resulted from intention (as opposed to chance) is greater than having a two-headed coin being tossed

27   100 times and 95 of those times it ending up on heads. *See* Docket No. 45, ¶ 178. The combination

28

of these two data points—one of the highest originations in the country, and one of the highest default rates in the country—points to the defendant being responsible for some of the largest losses of any lender in the FHA program.

The relator continued to work with the as the government requested and thus the government was aware that the relator would file an amended complaint with the additional allegations the government had said it would like to see prior to intervening in cases. The government told the relator that it wanted to see the allegations in the amended complaint prior to their filing. Relator agreed to do so and shared draft allegations with the government. The government then stated it wanted the amended complaint filed under seal so that it could investigate the allegations further and held out the possibility that it might now reach "a different conclusion."

In response, over a series of phone calls and e-mails, the relator stated that it was not possible to file the amended complaint under seal as the case had been unsealed at the government's request and the defendant was already a party to the litigation. The government attorneys became increasingly upset with relator's counsel that the amended complaint would not be filed under seal, although the government proposed no viable way in which that could be accomplished. Relator offered to work cooperatively with the government to resolve the issue in another way, but the government refused.

During these conversations, the government became increasingly bellicose about the issue of filing under seal issue, despite being unable to provide any basis for doing so. The government continually insisted the law required it when the reverse is true. The government then repeatedly threatened severe consequences as retaliation against the relator if she did not file the amended complaint under seal, noting on several calls that it had the ability to move to dismiss the complaint. The relator again offered to cooperate in any way possible, and noted that there was no basis under the statute to retaliate against the relator for filing the amended complaint as required by law. The government offered no viable alternative and told the relator she would face severe consequences should she publicly file the amended complaint.

The relator filed the amended complaint, as required by law. Despite the additional

information in the amended complaint that was exactly what the government said could result in a different decision, the government admittedly conducted no further investigation into the claims following the filing of the amended complaint.  *See* Docket No. 60 at 3 ("Relator filed the amended complaint after the United States declined to intervene without a seal period for the United States to investigate.").

Instead, the government carried through on its threat and filed this motion to dismiss the amended complaint which it never investigated—even though it never moved to dismiss the less robust original complaint on which it had conducted a cursory review.

***The Motion to Dismiss***

Even though the government initially said it would move to dismiss the complaint for not filing the complaint under seal, its position changed when it filed this motion.[5] The government's

---

[5]  Apparently the government realized, as relator had told the government, that the amended complaint could not be filed under seal, the FCA does not require it and that a motion on that basis had no support. *See e.g., United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.,* 668 F.Supp.2d 780, 802 (E.D. La. 2009) (filing amended complaint under seal was not required); *Wisz ex rel. United States v. C/HCA Dev., Inc.,* 31 F.Supp.2d 1068, 1069 (N.D. Ill. 1998) (statute does not required amended complaints to be filed under seal and pointing out that the "second amended complaint alleged the same type of fraudulent conduct as the original complaint, which the Government already had a chance to review."); *United States ex rel. Milam v. Regents of Univ. of Cal.,* 912 F.Supp. 868, 890 (D. Md. 1995) ("Neither the statute nor any relevant case law imposed upon [the relator] the duty to file any amendments to that complaint in camera and under seal."); *U.S. ex rel. Stewart v. Altech Servs., Inc.,* No. CV-07-0213, 2010 WL 4806829, at *2 (E.D. Wash. Nov. 18, 2010) (holding that "by its terms, § 3730(b)(2) applies only to the complaint and not to any amended complaint"); *United States ex rel. Mikes v. Straus,* 931 F. Supp. 248, 259–61 (S.D.N.Y. 1996); *U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.,* 972 F. Supp. 2d 1317, 1327 (N.D. Ga. 2013) (rejecting argument that 3730(b)(2) applies to amended complaints after a case is unsealed, noting court's concern that to sidetrack the matter for such a "re-sealing" process risked "stagnation of evidence and unnecessary prolonging" of the case). While a minority of courts hold that an amended complaint must be filed under seal, those are limited to circumstances in which an amended complaint adds new defendants or new causes of action, an amended complaint which only adds details or is a "mere variation on a theme" is not required to be filed under seal, which did not occur here. *See U.S. ex rel. Ubl v. IIF Data Sols.,* No. CIV.A. 1:06-CV-641, 2009 WL 1254704, at *4 (E.D. Va. May 5, 2009) ("The amended complaint merely added specificity to the allegations contained in the original complaint. It did not assert additional claims for relief or plead drastically different allegations."); *E. Bay Mun. Util. Dist. v. Balfour Beatty Infrastructure, Inc.,* No. 13-CV-02032-WHO, 2014 WL 2611312, at *3 (N.D. Cal. June 11, 2014) (amended complaint that added new defendants and additional details was not required to be filed under

(footnote continued)

1   motion relies exclusively on the complaint failing a undisclosed purported cost-benefit analysis:

2   "the United States has the right to undertake a cost-benefit analysis and to conclude it is not in the

3   public interest to spend further time and resources on Relator's litigation of this matter." *See* Docket

4   No. 60 at 7.

5          Notably, the government submitted no record evidence in support of its motion, and, even

6   on reply, it only submitted an untimely affirmation from Christopher Reimer, which merely noted

7   discovery that had taken place in three other mortgage fraud cases, making no mention of this case

8   or the potential costs in this case. *See* Docket No. 69-1. Further there is no evidence that the

9   government considered any cost-containing devices, including those in the federal rules, such as

10  Federal Rules of Civil Procedure 26(b)(1) or 26(c), or otherwise provided by law, such as *Touhy*

11  subpoenas.[6]

12         Nor is it even clear that the government has ever actually performed the cost-benefit analysis

13  that it alludes to. Its papers are bereft of any such analysis. They certainly contain no analysis on the

14  "benefit" side of the cost-benefit equation. It is telling that the government has entirely omitted half

15  of the analysis, particularly given the large recoveries it has collected from lenders like Academy.

16  All in all, the government has recovered billions of dollars for taxpayers from mortgage fraud cases.[7]

17  There would be no reason to believe this case would not also have a significantly positive result

18  given the robust allegations of fraud and the volume of loans Academy originated, as one of the top

19  lenders in the country. Certainly the government could not know it given its lack of investigation.

20         It did not do so when asked by this Court.

21  _____

22         seal); *United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 198, (S.D.N.Y.
23         2016) (holding that relator was not required to file an amended complaint under seal when
           the pleading added allegations that were merely "variations on [the same] theme" and "the
24         Government was afforded the opportunity to intervene, elected not to do so.").

25  [6]    The HUD *Touhy* regulations allow the government to limit the material to be provided if
           the production would be unduly burdensome or otherwise inappropriate in light of the rules
26         of discovery. 24 C.F.R. § 15.204(a)(2)(vii).
    [7]    The government recovered $3.1 billion from housing and mortgage fraud in its FY 2014
27         alone.   *See*   https://www.justice.gov/opa/pr/justice-department-recovers-nearly-6-billion-
           false-claims-act-cases-fiscal-year-2014
28  _____

1        Further, the government has never disclosed the number of claims already filed based on

2   mortgages originated by Academy. In fact, the government has said it has not even bothered to look

3   at such data, even though that would be a significant component in analyzing the scope of any

4   recovery. The government has suggested that the only information that it needed to conduct its

5   analysis was from HUD's publicly available Neighborhood Watch website. This data, however, is

6   of no use in determining a mortgagor's potential exposure.

7        First, the Neighborhood Watch data is limited to a two-year look-back period from the date

8   of the report, and only takes into account claims made on originations during that time period.  A

9   couple of problems arise from that, including that such data necessarily does not include the entire

10  statute of limitations going back six years and that a number of claims will be omitted. Each is

11  describe in more detail below.

12       The short time frame of the data is problematic because it does not reflect the actual number

13  of claims and completely ignores the six-year statute of limitations of the FCA. It also ignores the

14  government is subject to claims over the entire 30 year life of a mortgage loan.  The government's

15  two-year look-back is not at all consistent with the government's own settlement position in similar

16  matters. Typically, the government looks at claims for the full statute of limitations, and oftentimes

17  well beyond that.[8] *See e.g.*, *U.S. ex rel . Dougherty v. Guild Mortgage,* No. No. 3:16-cv-02909-

18  JAH-BLM, (S.D. Cal.) (for a *qui tam* suit filed by a relator in December 2013, the United States'

19  Complaint-in-Intervention states that it is seeking damages for loans underwritten and endorsed

20  between January 1, 2006 and December 31, 2011); *U.S. ex rel. Shackleford v. IberiaBank*

21  *Corporation*, No. No. 15-cv-416-BRW (E.D. Ark.) (*qui tam* lawsuit filed in July 2015 settled claims

22  submitted for insurance between January 1, 2005 and December 31, 2014[9]); *U.S. ex rel.*

23  *Kelschenbach v. M&T Bank*, No. 13-cv-280 (W.D.N.Y.) (*qui tam* complaint filed in March 2013

24

25  [8]     This may be in part due to the fact that while a loan may be endorsed and submitted for FHA
26      insurance beyond the six-year statute of limitations under the FCA, the actual claim is
        submitted to the government years later. This is discussed further below.
27  [9]     *See* https://www.justice.gov/opa/pr/iberiabank-agrees-pay-over-116-million-resolve-
        alleged-false-claims-act-liability-submitting.

28                                                    8

with settlement involving mortgages submitted for insurance between January 1, 2006 and December 31, 2011); *U.S. ex rel. Bozzelli v. PHH Mortgage Corp.*, No. 13-cv-3084 (E.D.N.Y.) (*qui tam* complaint filed in May 2013 with settlement involving mortgages insured between January 1, 2006 and December 31, 2011); *United States ex rel. Mann et al. v. Fifth Third Bancorp*, No. 11-cv-4499 (S.D.N.Y.) (*qui tam* lawsuit filed in June 2011 with settlement involving loans originated between 2003 and 2013); *United States ex rel. Edwards v. JPMorgan Chase Bank*, No. 13-cv-220 (S.D.N.Y.) (*qui tam* filed in January 2013 with settlement including loans submitted for FHA loans from January 2002 to the signing of the settlement agreement in February 2014).

Further, the Neighborhood Watch data does not provide a reliable measure of potential claims. All that Neighborhood Watch reports are claims made for any loans *originated* during the two years prior to the report. For example, for a report from July 2017, the claims number would cover loans that were originated only after July 2015, but not any loans originated before that time, despite the fact that these loans would continue to default and this number would obviously increase with the passage of time.

Therefore, these early defaults represent just the sharp tip of the spear of taxpayer exposure. It is actually very surprising to even see a default in a two year look-back period. Very few mortgages translate into government payments in the first several years: the borrower has to default (which rarely happens right away); the lender is required to try to work a re-payment plan out with the borrower; if that does not succeed, the lender and government attempt to sell the property; if that does not work, the property goes into foreclosure; only after that lengthy legal process is completed can the property be sold; and only then can the lender file a request for insurance for those losses with the government. Given the length of that process, and that some mortgages carry a 30-year term, the claims that appear early on are just a faint warning of things to come. Given Academy's statistically significant rate of claims on the government, described below, and the actually very high number of defaults over a two-year look back period, the taxpayer should expect to incur very large losses due to Academy both now and in the years to come. *See* https://www.hud.gov/sites/dfiles/Housing/documents/FHALPT_Sep2017.pdf at *6 (according to

HUD's own data as of September 2017 for loans liquidating in August 2017, the average delinquency process took 13.2 months, the average foreclosure process took 14.7 months, and the average deed transfer process took 12.7 months; the total average time for the entire process would therefore be at least 40.6 months, which does not even include the time for the claims submission process to HUD). In fact, the government has acknowledged in other False Claims Act litigation involving FHA fraud that additional claims will continue to accumulate during the pendency of an action. *See U.S. ex rel. Dougherty v. Guild Mortgage*, No. 3:16-cv-02909-JAH-BLM, (S.D. Cal.) Dkt. 20 at ¶ 102 ("Many additional claims are expected on loans endorsed for FHA insurance by Guild during the Lending Time Period.").

Additionally, a review of the government's recent FHA settlements shows that even a small number of claims listed in a Neighborhood Watch report at or near the time of filing, will likely result in significant settlements for the government. For example, the government's very recent settlement with IBERIABANK illustrates that even a small number of claims appearing on Neighborhood Watch results in an eight-figure settlement for the government.  At the time that the case was filed by the relators in July 2015, the 2014 Q3 Neighborhood Watch data (showing all insured single family loans with beginning amortization date between October 1, 2012 and September 30, 2014) showed that there were only two claims submitted for insurance during that time span. However, this case has just resulted in an $11.7 million dollar settlement for the United States. Notably, Iberia had 5,061 originations during this time, less than a third of the 17,991 originations that Academy had during this same time frame. Other settlements by the government show the same: M&T Bank ($64 million settlement; filed in March 2013; Neighborhood Watch claims data for 2014 Q3 shows only two claims)[10]; PHH[11] (FHA settlement for $45,500,000; filed in May 2013; Neighborhood Watch claims data for 2014 Q3 shows only six collective claims);

---

[10]     The oldest quarterly data available data available on HUD's Neighborhood Watch website is for 2014 Q3, which covers loans originated between October 1, 2012 and September 30, 2014.

[11]     This includes both PHH Home Loans LLC and PHH Mortgage Corporation.

JPMorgan Chase Bank, ($564.6 million for FHA portion of settlement; filed in January 2013; Neighborhood Watch claims data for 2014 Q3 shows only four claims despite 24,979 originations).

Moreover, the number of claims reported by the government and Academy differ, calling into question the reliability of the data.  In early April 2017, prior to the relator filing her amended complaint, counsel for the United States indicated to relator's counsel that there were only three claims filed since the beginning of relator's employment with defendant (providing a report for loans with originating between March 1, 2015 and February 28, 2017), while a current Neighborhood Watch report for loans originating between April 1, 2015 and March 31, 2017 shows that there were fifteen claims filed during this time. Additionally, defendant suggested in its initial Motion to Dismiss that "claims have been submitted for only 10 loans Academy originated nationwide during the time that Relator has been employed by Academy." Dkt. No. 23-1. Furthermore, the current HUD Neighborhood Watch data indicates that there are currently six claims (which is more than the three reported by the government).

Additionally, the government has never been clear regarding the scope of the three claims it has repeatedly cited, suggesting that it may have limited its claims analysis to only the time and region for which the relator worked and inconsistently describing the time periods from which it reviewed the Neighborhood Watch data.[12] Even if the claims were (improperly) limited in this way, this suffers the same infirmity discussed above in that a small number of claims at or around the time of filing still results in millions of dollars in settlement value. But this is even more problematic given that the proper calculation of claims under the FCA would need to be calculated based on the entire company and for the full six-year statute of limitations period.

Perhaps most important, the number of claims filed is not the exclusive factor when the

---

[12]  For example, the government has referred to three claims as (1) three claims for loans endorsed since the beginning of relator's employment (which would run from approximately August 2015 to April 2017 when the government made that representation); or (2) for claims for insurance endorsed during her time at Academy (which would only be from approximately August 2015 to July 2016). Given the government's shifting definitions of the three claims, it is unclear to relator if this is a deliberate attempt by the government to misconstrue the claims numbers.

16-CV-02120-EMC

1    government assesses a defendant's exposure in a mortgage fraud case.  Instead the government looks

2    beyond the claims data and actually considers the number of loans endorsed for insurance that have

3    material defects in the underwriting, based on a review of a sample of loans.  Thus, while the claims

4    information may be an early warning sign, an actual assessment of value cannot be performed by

5    the government until it actually reviews the loan files.

6           Therefore, given the inherent problems with the Neighborhood Watch data described above,

7    including the limited two-year window, the failure to conduct a proper look-back over the full statute

8    of limitations, and the accumulation of claims over time, it is incredibly likely that the number of

9    claims is exponentially higher. Because the government is fully aware of all of these limitations on

10   Neighborhood Watch data, any purported reliance on such data would merely be a cover for an

11   arbitrary decision to seek dismissal of the case.

12

13                                          **ARGUMENT**

14   **I.     There is no Dispute that the *Sequoia Orange* Standard Governs this Motion.**

15          The controlling law governing government motions to dismiss FCA complaints is set forth

16   in *U.S. ex rel. Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145 (9th Cir.

17   1998). Although the government avoids citing *Sequoia Orange* as much as possible, it, too, agrees

18   that *Sequoia Orange* provides the standards to analyze their motion to dismiss. *See* United States

19   Memorandum of Law in Support of Motion to Dismiss, Dkt. No. 60, at 5:2-9; *see also* Oral

20   Argument at 9:11-12, 16.

21          Under the *Sequoia Orange* test, the government must first identify 1) a valid government

22   purpose and 2) a rational relation between dismissal of the complaint accomplishment of that

23   purpose. *Id.* These two steps mirror the "rational basis test" that is applied to test a variety of

24   governmental actions. *See e.g., Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588-89 (9th Cir. 2008)

25   (denial of leased land). Under *Sequoia Orange*, however, the government does not prevail simply

26   by meeting this two-step test. Instead, the government's motion will still be denied if the relator can

27   establish that despite meeting those two factors, the government's requested dismissal is based on

28

1  "fraudulent, arbitrary and capricious, or illegal" reasons. *Id.*

2  The Ninth Circuit provided some examples of what would qualify as "fraudulent, arbitrary

3  and capricious, or illegal" reasons. Because "the issue is one of statutory interpretation," the Ninth

4  Circuit looked to the text of the FCA and the surrounding legislative history. *Id.* at 1143. The text

5  of the FCA imposes several limitations on the government's ability to dismiss a case. As a starting

6  premise, if the government does not intervene, the statute gives the relator the right to conduct the

7  action. *Id.* (*citing* 31 U.S.C. § 3730(b)(4)(A)). Further, the FCA only allows the government to

8  intervene upon a showing of "good cause"—a standard the government acknowledges should be

9  construed as part of the analysis of its motion to dismiss because it did not formally move to

10  intervene. (Oral Argument at 6:20-7:4) *Sequoia Orange*, 181 F.3d at 1143. In addition to requiring

11  the government to meet the "good cause" standard, the FCA further only permits dismissals if the

12  relator has an opportunity to object, and after a hearing on the motion. *Id.* (*citing* 31 U.S.C. §

13  3730(c)(2)(A)).

14  In *Sequoia Orange* the Ninth Circuit held that these provisions, as well as the legislative

15  history, provided relators a "check" on the government's motion to dismiss a case to ensure "suits

16  are not dropped without a legitimate government purpose." *Id.* at 1145. In *Sequoia Orange*, the

17  Ninth Circuit rejected the relator's argument that this check was so broad that it allowed any

18  meritorious case to proceed. *Id.* Instead, the "check" was a more narrow one that prevented the

19  government from moving to dismiss for "fraudulent, arbitrary and capricious, or illegal" reasons.

20  More specifically, by drawing on the Senate Report to the 1986 Amendments, the Ninth Circuit

21  provided some examples of what would constitute fraudulent, arbitrary and capricious, or illegal

22  reasons, including evidence that the government: 1) did not fully investigate the allegations; 2)

23  neglected evidence; 3) dropped the case without legitimate reasons; 4) acted arbitrarily or on

24  improper considerations; 5) provided fraudulent reasons; 6) caused undue delay; or 7) acted

25  unreasonably in light of all the existing evidence. *Id*. at 1144-45 (*citing* S.Rep. No. 99-345, at 25-

26  26 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291). The factors identified in *Sequoia Orange*

27  are disjunctive, not conjunctive by the government, and are just some examples of the reasons why

28

1   a motion to dismiss would be denied.

2         *Sequoia Orange* demonstrated the application of this rule. In *Sequoia Orange* there was no

3   doubt the government was familiar with the facts of that case and had examined all the evidence.

4   Further, the government's decision was not arbitrary—it was acting consistently in all similar cases.

5   The government, though, simply came to a different, but legitimate, conclusion than the relator in

6   light of all those facts of the case and moved to dismiss the action. Therefore, the government's

7   decision to move to dismiss warranted deference.

8         Under *Sequoia Orange*, however, the government does not act with a legitimate purpose—

9   and is acting arbitrarily and capriciously—when it seeks dismissal of a case that it has not fully

10   investigated or that it has neglected evidence; or when that decision is unreasonable in light of all

11   available evidence or is based on arbitrary reasoning that simply follows the whim or caprice of a

12   governmental official. Therefore, the *Sequoia Orange* analysis does not turn so much on the

13   substantive outcome of the government's decision, but instead on the reasonableness of the

14   government's underlying investigation and whether the government reasonably and consistently

15   applied its analysis to the facts of the relator's case. In other words, the government is free to decide

16   whether to dismiss any case or not, provided it has acted with legitimacy in reaching that decision,

17   including such basic steps as conducting an appropriate investigation and ensuring that its decision

18   resulted from a consistently applied rationale. This standard is so uncontroversial that the Ninth

19   Circuit's has reaffirmed it again in a more recent unpublished decision. *Mateski v. Mateski*, 634 Fed.

20   App'x. 192, 194 (9th Cir. 2015).

21      Although the government has no choice but to acknowledge that *Sequoia Orange* governs the

22   outcome of the motion, the government is clearly uncomfortable with applying the test to this case.

23   The government therefore advances several arguments to avoid the actual application of *Sequoia*

24   *Orange* to this case, none of which are successful.

25      **II.**     ***Sequoia Orange* Properly Relied on the FCA's Legislative History.**

26         For the first time at oral argument the government suggested that his Court should actually

27   ignore the seven-factor *Sequoia Orange* standard. It argued that the Ninth Circuit had improperly

28

     16-CV-02120-EMC

1   used the FCA's legislative history. *Id.* at 1143, 1144. This argument is not correct.

2       It is not clear what the government gains by arguing that the Ninth Circuit is wrong. Given

3   that Ninth Circuit precedent is binding, the argument only underscores that the government's

4   argument is untenable.

5       The government makes no secret of the fact that its argument is a direct attack on the Ninth

6   Circuit's decision. The government's basis for ignoring *Sequoia Orange* is based entirely on *Swift*,

7   a decision from the Circuit Court of Appeals of the District of Columbia which disagreed with and

8   refused to follow the Ninth Circuit in *Sequoia Orange*. *Swift v. United States*, 318 F.3d 250, 253

9   (D.C. Cir. 2003). The government, therefore, leaves no ambiguity that its request that this Court

10   ignore *Sequoia Orange's* seven factors constitutes a wholesale rejection of Ninth Circuit precedent.

11       Further, the Ninth Circuit's reliance on the FCA's legislative history in *Sequoia Orange* is

12   not only the law in this Circuit, it is also correct. The government incorrectly argues that the Senate

13   Report relied "on an entirely different provision that was not enacted into the statute." (Oral

14   Argument at 26:22-3.) Actually, the Senate Report discussed a virtually identical provision to the

15   one enacted into law. The Senate Report was commenting on a draft provision that provided, "If the

16   government proceeds with the action . . . the [relator] shall be permitted to file objections with the

17   court and to petition for an evidentiary heard to . . . object to any motion to dismiss filed by the

18   Government." *Id.* at 253. The final provision was largely the same, and if anything was strengthened

19   in favor of the relator. The final language dispenses with the need for the relator to file objections

20   and to petition for a hearing and instead grants the relator "an opportunity for a hearing on the

21   motion" upon any filing of a motion to dismiss by the government. 31 U.S.C. § 3730(c)(2)(a). Given

22   the modest change in the final language, the government is incorrect to argue that the Ninth Circuit

23   erred in relying "on an entirely different provision that was not enacted into the statute." (Oral

24   Argument at 26:22-3.) Instead, the Ninth Circuit relied on the relevant provision and thus relied on

25   the appropriate legislative history. Other circuit courts including the Tenth Circuit, have adopted

26   *Sequoia Orange* and rejected *Swift*, including *Swift's* improper analysis of the legislative history.

27   *Ridenour v. Kaiser-Hill Co., LLC*, 397 F.3d 925, 936 (10th Cir. 2005) (*Sequoia Orange* comports

28

1   with the FCA's legislative history, not *Swift*). The Ninth Circuit continues to apply the non-exclusive

2   seven factors when evaluating FCA motions to dismiss. *Mateski*, 634 Fed. App'x. at 194.

3       Given that the legislative history supports the *Sequoia Orange* standard, the government's

4   argument against the decision and the relevant legislative history is without merit.

5   **III.    *Sequoia Orange* Test Controls Over Contrary Tests Arising in Other Contexts.**

6       In both its papers and at argument the government attempts to diminish *Sequoia Orange's*

7   standard by almost never citing the decision and instead basing its argument on tests from other

8   cases arising in other contexts (often death penalty cases) to imply, without actually stating, that a

9   different test than *Sequoia Orange* should be applied in this case. For example, at argument, the

10  government likened *Sequoia Orange* to standards involving constitutional tests in other contexts,

11  but was then forced to acknowledge that there is "tension" between the *Sequoia Orange* standard

12  and the cases on which the government relied. (Oral Argument at 9:9.) Certainly, to the degree there

13  is "tension" between *Sequoia Orange's* standards and constitutional standards in other cases (such

14  as *United States v. Redondo—Lemos*, 955 F.2d 1296, 1298-99 (9th Cir.1992) and *United States v.

15  Armstrong*, 48 F.3d 1508 (9th Cir. 1995)), the "tension" should always be resolved in favor of

16  applying *Sequoia Orange*. Citing other cases in other contexts that the government acknowledges

17  are in "tension" with *Sequoia Orange* does nothing to aid a proper application of the *Sequoia

18  Orange*. This is particularly true in regards to cases cited by *Sequoia Orange*, as well as those

19  decided prior to *Sequoia Orange*, because those cases already informed the holding in *Sequoia

20  Orange*.[13]

21      In its papers the government similarly cites death penalty cases to describe the standard that

22  should be applied on this motion to dismiss a FCA case. United States' Motion to Dismiss at 5:19-

23  26. First, again, the government does not dispute that the test to be applied to this motion is *Sequoia

24  _____

25  [13]    The government frequently argues that *Sequoia Orange's* test is a "constitutional" one.
    However, the Ninth Circuit stated in *Sequoia Orange* that its decision was one of "statutory

26  interpretation." *Id.* at 1143. The Ninth Circuit did, though, analogize the general *Sequoia
    Orange* test to constitutional tests. Ultimately, though, since all parties agree *Sequoia

27  Orange* applies to this motion, the label one attaches to *Sequoia Orange's* test does not alter
    the test or the outcome.

28                                                                16                            16-CV-02120-EMC

1    *Orange*. Therefore, citing Supreme Court cases about the use of FDA approved drugs in death

2    penalty cases decided long before *Sequoia Orange* runs far afield of the agreed inquiry here.

3            Second, even the case cited, *Hecker v. Chaney,* 470 U.S. 821 (1985), is of no use the

4    government.  In *Hecker*, the Supreme Court refused to review an administrative decision because it

5    found that the relevant Congressional statute had deliberately made that agency decision

6    unreviewable. The Supreme Court noted that the decision in *Hecker* was contrary to the normal rule

7    that agency decisions not to act or litigate cases *are reviewable* by courts as long as the relevant

8    statute does not forbid such a review, as in *Dunlop v. Bachowski*, 421 U.S. 560 (1975). Given that

9    the FCA itself explicitly contemplates judicial review of the government's reasons for its motion to

10   dismiss, and that *Sequoia Orange* sets forth those standards, it is perplexing that the government

11   would cite to *Hecker* where the relevant statute shielded agency decisions from review, as opposed

12   to the more common situation such as *Dunlop* which, like the FCA, explicitly allows a review of

13   agency decisions. Further, *Dunlop* shows that review of the government's decision not to prosecute

14   an action is something that courts have had no problem with analyzing and deciding for decades.

15   Doing the same under *Sequoia Orange* is neither innovative nor difficult.

16           Although we cannot anticipate every decision that the government will cite in its responding

17   papers, the government agrees the relevant standard is set forth in *Sequoia Orange* and therefore

18   strained and improper analogies to other cases does not diminish the application of *Sequoia Orange*

19   to this case.

20   **IV.     Relator has Met the Standard for a Hearing.**

21           The government argues that there is no need for a hearing in this case, either because the

22   reason it proffered (use of governmental resources) is so overwhelming as to meet the *Sequoia*

23   *Orange* standard, or because relator has not made a proffer sufficient to warrant a hearing. Both

24   arguments are incorrect.

25           First, under the multi-step *Sequoia Orange* test, the government cannot simply intone that a

26   case requires resources to monitor and thus the case must be dismissed. A claim regarding the use

27   of government resources may meet the rational basis component of *Sequoia's* first two factors

28

1    (identification of a valid government purpose and a rational relationship between dismissal and that

2    purpose). The government's generic assertion here, however, does not met the third prong of the

3    *Sequoia* test, namely, that that the government acted legitimately (*i.e.*, made a rational and consistent

4    decision after an appropriate investigation of the case). As the Ninth Circuit noted in *Sequoia*

5    *Orange* the government is free to "consider" the costs of monitoring a case. *Id.* at 1146. But the

6    freedom to "consider" cost does not mean the government can make improper considerations

7    regarding such costs, particularly when those considerations are not tied to a proper investigation,

8    or are divorced from a reasonable and consistent rationale for its decisions to dismiss such cases so

9    that the government makes decisions without any rhyme or reason. Further, if the government could

10   simply dismiss a case by citing its decision to spend resources to monitor a case, it would gut the

11   entire statutory framework of the FCA which expressly allows a relator to pursue a case, absent

12   good cause and a hearing on the government's motion to dismiss. Further, such a result would fly

13   in the face of the statute's legislative history.

14         Here in particular the government's evidence on the cost of monitoring is so limited and

15   untested that it does not warrant overriding the statute's and *Sequoia Orange's* requirement that a

16   hearing be held, and even more so given the proffers of the relator set forth in these papers.

17         However, if this Court does agree that the government can prevail on a motion to dismiss by

18   simply stating that it will take resources to monitor a case, then there would be no need for a hearing

19   because certainly the government will say the same at the hearing, and the relator does not dispute

20   that the government will incur some (limited) resources to monitor this action.

21         Second, the government contends that even if its proof is not sufficient, relator has failed to

22   meet the standard to warrant a hearing. When the government seeks to dismiss a relator's case under

23   31 U.S.C. § 3130(c)(2)(A), the plain language of the statute requires an evidentiary hearing:

24         The government may dismiss the action notwithstanding the objections of the
      person initiating the action if the person has been notified by the Government of
25         the filing of the motion and **the court has provided the person with an
      opportunity for a hearing on the motion.**
26

27   31 U.S.C. § 3130(c)(2)(A) (emphasis added).

28

Given this plain language, the Ninth Circuit in *Sequoia Orange* held that a relator should be afforded an evidentiary hearing upon a motion by the government to dismiss the case. 151 F.3d at 1145. The *Sequoia Court* held that an evidentiary "hearing is appropriate if the relator presents a colorable claim that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary or improper considerations.'" 151 F.3d at 1145 (quoting S. Rep. No. 99-345, at 26); *see also Mateski v. Mateski*, 634 Fed. App'x. 192, 194 (9th Cir. 2015).[14] At oral argument, the government conceded that a relator only needs to show this "colorable basis" to be entitled to an evidentiary hearing. Oral Argument at 8:17.

As discussed in detail above, the legislative history of the statute makes clear that a relator is entitled to an evidentiary history, despite the government's attempted argument to the contrary. The Senate Report refers not just to a hearing, but explicitly references an evidentiary hearing. S. Rep. No. 99-345, at 26 ("Any objections filed by the *qui tam* plaintiff may be accompanied by a petition for an evidentiary hearing on those objections."). Furthermore, given that the relator must show that the dismissal is unreasonable in light of the evidence, that the government has not investigated the allegations, or that dismissal is based on arbitrary or improper considerations, these are all factual issues that are related to an evidentiary hearing.

Additionally, the failure to conduct an evidentiary hearing would be a violation of relator's substantive due process rights. Where governmental action affects a statutory right, it must meet the rational basis test. *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990). And just like the above discussion regarding the government's dismissal, the government acts in an arbitrary and capricious

---

[14]     In an earlier decision, the Ninth Circuit had quoted the preceding sentence of S. Rep. No. 99-345, which states that "evidentiary hearings should be granted when the *qui tam* relator shows a 'substantial and particularized need' for a hearing." *U.S. ex rel. Kelly v. The Boeing Co.*, 9 F.3d 743, 753 n. 11 (9th Cir. 1993). However, given that S. Rep. No. 99-345 states that "[s]uch a showing" could be made by showing one of the three conditions, *Sequoia Orange* properly recognizes that there is not a heightened requirement and a relator is only required to show a "colorable claim" that the dismissal is either unreasonable in light of the evidence, the government failed to properly investigate, or that the decision is arbitrary and improper.

manner when it has not fully investigated the allegations or has neglected evidence, when it make a decision that is unreasonable in light of all available evidence, or when it makes a decision based on arbitrary or improper reasoning. As the government therefore does not meet the rational basis standard, the failure to hold an evidentiary hearing would violate relator's substantive due process rights.

Here, an evidentiary hearing is readily warranted. As discussed in detail below, relator has presented far beyond just a "colorable claim" that dismissal is unreasonable in light of the existing evidence, that the government failed to investigate her allegations, and that the government's dismissal was based on arbitrary or improper considerations. Given that relator has shown not just one, but all three of these conditions, this Court must provide relator with the required evidentiary hearing.

## V.       Relator Will Demonstrate at the Evidentiary Hearing that the Government's Decision to Seek Dismissal was Arbitrary Under *Sequoia Orange*

Finally, the Court requested additional briefing concerning what relator intends to show at the hearing and the exhibits and witnesses that relator may use at the hearing. At the hearing, relator intends to show that the government's motion fails under the *Sequoia Orange* standard because the evidence relevant to each factor shows the government's decision was arbitrary.  In particular, relator expects the evidence will show that the government did not fully investigate the allegations, neglected evidence, seeks to dismiss the case without a legitimate reason, relied on an improper consideration in seeking dismissal, provided fraudulent reason in seeking dismissal, is causing undue delay, and acted unreasonably in light of all of the evidence.

### A.       The Government Did Not Fully Investigate the Allegations

Under *Sequoia Orange*, a government decision is arbitrary if it was made without a full investigation into the facts. We intend to show at the hearing that the Government failed to fully investigate the facts set forth in the complaints in this matter.  We believe the evidence that will show this includes the following, discussed more fully above:

- The government did not fully investigate the original complaint filed by relator.

- The government conducted **no** investigation of the amended complaint.

- The government did not gather any documents from the defendant or engage in any review of electronically stored information from the defendant.

- The government did not examine any loan files.

- The government did not interview any other employees or witnesses who could speak to relator's allegations.

- The government never investigated any company-wide violations, including information in the amended complaint provided by employees who worked at locations around the country and even those specifically identified by relator in her initial disclosures, as well as those set forth in the original complaint.

- The government never conducted an investigation covering the time period of the statute of limitations, or the relevant time period described in the complaint.

- The government did not investigate Academy's statistically significant poor lending history.

- The government did not investigate any of the relevant claims data regarding Academy.

- The government neglected to review the actual number of claims filed by Academy and to investigate the potential number of claims from Academy's originations in the future.

- The government cited to Neighborhood Watch data even though it knew that the data does not provide a picture of the claims or potential claims.

- The government cited to Neighborhood Watch data even though the value of the case can only be assessed by actually looking at the loan files and measuring the deficiency rates in those files.

- To the extent the government reviewed claims data only for relator's location and/or time period, the government did not fully investigate evidence of additional claims.

- The government did not fully investigate the potential benefits of this case, which are substantial given Academy's origination rate and poor lending history.

Ultimately, the government would only be in a position to make an informed, non-arbitrary decision about the claims in this case after a full investigation into the facts. Making a decision

based on less than a full investigation means the government has arbitrarily decided to seek dismissal of the claims. Given the lack of an investigation here, the evidence will show that the decision to move to dismiss could only be arbitrary.

**B.    The Government Neglected Evidence**

*Sequoia Orange* also provides that a decision by the government is arbitrary when the government neglects evidence in a case. In this case, the government neglected evidence concerning the claims, including the following, as discussed more fully above:

- The government neglected evidence in the original complaint and amended complaint of company-wide violations, including information in the amended complaint from employees who worked at locations around the country and even those specifically identified by relator in her initial disclosures as well as those set forth in the original complaint.

- The government neglected evidence in the amended complaint establishing Academy's poor lending practices as statistically significant.

- The government neglected evidence it could have collected from the defendant and from other employees or witnesses.

- The government ignored evidence that the combination of Academy's poor lending history and volume of originations would result in a significant recovery for the government.

- The government neglected to review the actual number of claims filed by Academy or potential claims arising from Academy's originations in the future.

- In relying on Neighborhood Watch data, the government neglected evidence of claims outside of that limited data.

- The government neglected to look at claims for the full statute of limitations, although it has typically looked back for the full statute of limitations, or longer, in other matters.

- In relying on Neighborhood Watch data, the government neglected other evidence it typically considers in evaluating exposure, such as the rate of deficient loan files.

- In relying on Neighborhood Watch data, the government neglected evidence that the data was not reliable.

- The government neglected evidence that the Neighborhood Watch and that similar claims data has resulted in large settlements for the government.

- To the extent the government reviewed claims data only for relator's location and/or time period, the government neglected evidence of additional claims.

- The government completely neglected to consider the potential benefits, which are substantial given Academy's origination rate and poor lending history.

- The government neglected evidence that cases against lenders with similar Neighborhood Watch data have resulted in significant recoveries for the government.

- In its purported cost-benefit analysis, the government neglected to consider potential cost-containment devices.

Because the government neglected facts in this matter, it would not be able to make a decision that was something other than arbitrary.

## C.     The Government Seeks to Dismiss the Case without Legitimate Reasons

The *Sequoia Orange* factors also include whether the government seeks to dismiss the case without legitimate reasons.  Here, the government relies on a purported cost-benefit analysis to support its motion to dismiss.  We intend to show that this reason is not legitimate through evidence including the following, as discussed more fully above:

- There is no evidence that the government actually performed a cost-benefit analysis.

- The government's purported cost-benefit analysis only discussed potential costs, and completely ignored the benefits.

- An actual cost-benefit analysis would have taken into account evidence that the combination of Academy's poor lending history and volume of originations would result in a significant recovery for the government.

- The government did not submit any record evidence concerning potential costs in this case.

- The government relies on potential costs in this matter even though no discovery has been served on the government.

- The government only submitted speculative evidence based on discovery that has taken place in other cases.

- The government did not consider cost-containing devices that might apply to any discovery.

- There is reason to believe the government's purported cost-benefit analysis was not

23

the reason it filed this motion but instead because it was angry that relator did not file the amended complaint under seal.

- By declining to intervene in the case, the government has an increased incentive to dismiss the case because the relator's statutory award has increased from only 15-25%, to 25-30%.

Because the government's purported cost-benefit analysis failed to consider the benefits, lacks any actual support in terms of the cost and ultimately was not the reason the government moved to dismiss, it is not a legitimate reason for seeking dismissal and therefore must be arbitrary.

**D.    The Government Relied on an Improper Consideration in Moving to Dismiss**

*Sequoia Orange* also provides that a decision by the government is arbitrary when the government relies on improper considerations in moving to dismiss. Here, the government improperly considered the flawed Neighborhood Watch claims data. At the evidentiary hearing, relator will show that it was improper for the government to rely on this data, including the following, described in more detail above:

- The government cited to Neighborhood Watch data even though it knew that the data does not provide a picture of the claims or potential claims.

- The government did not consider reviewing the actual number of claims filed by Academy or potential claims arising from Academy's originations in the future.

- In relying on Neighborhood Watch data, the government did not consider evidence of claims outside of that limited data.

- The government failed to look at claims for the full statute of limitations, although it has typically looked back for the full statute of limitations, or longer, in other matters.

- In relying on Neighborhood Watch data, the government neglected other evidence it typically considers in evaluating exposure, such as the rate of deficient loan files.

- In relying on Neighborhood Watch data, the government neglected evidence that the data was not reliable.

- To the extent the government reviewed claims data only for relator's location and/or time period, the government did not consider evidence of additional claims.

1  Because the government relied on improper considerations, its decision to move to dismiss

2  is arbitrary.

3

**E.      The Government Provided Fraudulent Reasons for Seeking Dismissal**

4

5      Another indication that the government's decision is arbitrary under *Sequoia Orange* is when

6  the government provides fraudulent reasons for seeking dismissal. At the hearing, relator intends to

7  show that the government's motivation in moving to dismiss had nothing to do with its cost-benefit

8  analysis but was instead because the government was incensed that relator did not file the amended

9  complaint under seal.   We believe the evidence that will show this includes the following, as

10  discussed more fully above:

11

12      • The government threatened relator with severe consequences if she did not file the
         amended complaint under seal.

13

14      • The government moved to dismiss the amended complaint because it was angry that
         relator did not file it under seal.

15

16      • The government never moved to dismiss the original complaint but only moved to
         dismiss the amended complaint even though the amended complaint was more robust
         than the original.

17

18      • The government only moved to dismiss once the relator's share of any recovery

19         increased by operation of the FCA.

20      Thus, the clear conclusion to be drawn is that the government was not motivated to move to

21  dismiss based on its "investigation" (which it had completed no later than December 2016) but

22  because it was angry that relator had not filed the amended complaint under seal as it had demanded.

23  That is a fraudulent reason.

24  **F.      The Government's Motion to Dismiss is also Causing Undue Delay**

25      Undue delay is another factor under *Sequoia Orange*. Here, the evidence shows that by filing

26  its motion, the government is causing undue delay.   The government waited to file its motion until

27  after the briefing had been completed on Academy's motion to dismiss, filed months earlier.

28

Presently, Academy's motion has been stayed pending resolution of this motion.  The government's motion will ultimately hold this case up for months.  As a result, the government's motion is causing undue delay.

**G.    The Government Acted Unreasonably in Light of all the Existing Evidence**

*Sequoia Orange* also instructs the Court to consider whether the government acted unreasonably in light of all of the existing evidence.

We believe the evidence that will show this includes the following:

- The government did not fully investigate the amended complaint filed by relator.

- The government conducted **no** investigation of the second complaint.

- The government did not gather any documents from the defendant or engage in any review of electronically stored information from the defendant.

- The government did not examine any loan files.

- The government did not interview any other employees or witnesses who could speak to relator's allegations.

- The government acted unreasonably in light of evidence in the original complaint and amended complaint of company-wide violations, including information in the amended complaint from employees who worked at locations around the country and even those specifically identified by relator in her initial disclosures as well as those set forth in the original complaint.

- The government never conducted an investigation covering the time period of the statute of limitations, or the relevant time period described in the complaint.

- The government acted unreasonably in light of the evidence of Academy's statistically significant poor lending history.

- The government did not investigate any of the relevant claims data regarding Academy.

- The government acted unreasonably in light of the evidence of the actual number of claims filed by Academy and the potential number of claims from Academy's originations in the future.

- The government cited to Neighborhood Watch data even though it knew that the data does not provide a picture of the claims or potential claims.

- The government cited to Neighborhood Watch data even though the value of the case can only be assessed by actually looking at the loan files and measuring the deficiency rates in those files.

- The government did not fully investigate the potential benefits of this case, which are substantial given Academy's origination rate and poor lending history.

- The government acted unreasonably in light of evidence in the amended complaint establishing Academy's poor lending practices as statistically significant.

- The government acted unreasonably in light of evidence it could have collected from the defendant and from other employees or witnesses.

- The government acted unreasonably in light of evidence that the combination of Academy's poor lending history and volume of originations would result in a significant recovery for the government.

- In relying on Neighborhood Watch data, the government neglected evidence of claims outside of that limited data.

- In relying on Neighborhood Watch data, the government acted unreasonably due to evidence that the data was not reliable.

- The government neglected to look at claims for the full statute of limitations, although it has typically looked back for the full statute of limitations, or longer, in other matters.

- To the extent the government reviewed claims data only for relator's location and/or time period, the government neglected evidence of additional claims.

- The government neglected evidence that cases against lenders with similar Neighborhood Watch data have resulted in significant recoveries for the government.

- In its purported cost-benefit analysis, the government neglected to consider potential cost-containment devices.

- There is no evidence that the government actually performed a cost-benefit analysis.

- The government's purported cost-benefit analysis only discussed potential costs, and completely ignored the benefits.

- The government did not submit any record evidence concerning potential costs in this case.

- The government relies on potential costs in this matter even though no discovery has been served on the government.

- The government only submitted speculative evidence based on discovery that has

27

taken place in other cases.

- There is reason to believe the government's purported cost-benefit analysis was not the reason it filed this motion but instead because it was angry that relator did not file the amended complaint under seal.

- By declining to intervene in the case, the government has an increased incentive to dismiss the case because the relator's statutory award has increased from only 15-25%, to 25-30%.

- The government threatened relator with severe consequences if she did not file the amended complaint under seal.

- The government never moved to dismiss the original complaint but only moved to dismiss the amended complaint even though the amended complaint was more robust than the original.

Thus, given all of the evidence referenced above, there is no doubt that the Government acted unreasonably and arbitrarily.

**H.    Witnesses and Exhibits at the Evidentiary Hearing**

Relator does not believe that many of the facts to be presented at the hearing, as discussed above, are in dispute and therefore could potentially be presented through stipulated facts. In the event that disputes do exist regarding the facts, relator proposes that the parties be allowed to conduct discovery on those issues.

Relator believes the following process could be used to identify any disputes concerning the facts, thereby identifying and limiting any potential discovery: relator would provide the government with a proposed statement of stipulated facts.  Within 15 days from receipt of the proposed stipulated facts, the government could respond and identify any facts it disputes. The parties would then meet and confer on the disputed facts and to the extent not resolved, identify the discovery necessary to resolve those disputes.  To the extent disputes arise concerning discovery, the parties would submit the dispute to the Court for resolution.

In the event that a hearing would still be necessary on some or all of the issues, depending on the outcome of the process to reach an agreement on stipulated facts, relator proposes that the parties each identify any potential witnesses and exhibits, including any that may be used for

rebuttal, based on the facts presently in the record or that the party anticipates using at the hearing 60 days before the hearing.  The parties can then confer on and conduct any additional discovery necessary for the hearing.

Although it would seem premature to identify witnesses given the state of the record, the following is a list of potential witnesses for the hearing:

| Witness | Potential Testimony |
|---|---|
| Christopher Reimer | Government attorney who submitted an affirmation in support of the government's cost analysis in this matter; also the government attorney who threatened retaliation if relator did not file the amended complaint under seal.[15] |
| Government official with knowledge of recoveries in other mortgage fraud cases | Testimony concerning the amounts the government has recovered in other mortgage fraud cases. |
| Government official with the most knowledge of the investigation into the claims in this matter. | Testimony concerning actions taken to investigate the claims in this matter, including those in the original complaint and in the amended complaint |
| Government official with the most knowledge concerning the decision to move to dismiss | Testimony concerning what factors the government considered when moving to dismiss. |

With respect to potential exhibits, relator believes that many of these are publicly available (such as in the record in this case already) or would be communications between the parties. However, she would identify additional exhibits based on any discovery conducted as described above.

Finally, although relator believes that much, if not all, of the evidence can be submitted through stipulated facts, she estimates that the hearing would last three to five days.

---

[15]   Although Mr. Reimer is an attorney, there are no privilege issues invoked with his testimony. By submitting a declaration, he has injected himself as a fact witness which therefore waives any privilege. *See Arizona ex rel. Goddard v. Frito-Lay, Inc.*, 273 F.R.D. 545, 558 (D. Ariz. 2011) (permitting deposition of agency attorney where party asserting privilege waived attorney-client privilege by injecting the attorney into the litigation as a fact witness); *accord Younger Mfg. Co. v. Kaenon, Inc.*, 247 F.R.D. 586 (C.D. Cal. 2007).

1

## **CONCLUSION**

2        Relator requests an evidentiary hearing because she believes the government's decision to

3 seek dismissal is arbitrary and retaliatory, for all of the reasons set forth above.  If those facts are

4 established at an evidentiary hearing, relator believes the government's motion should be denied.

5 For its part, we understand the government's position to be that even if relator was able to establish

6 the facts set forth above at an evidentiary hearing, the government's motion should still be granted

7 because it has nearly unfettered discretion to seek dismissal based on its assertions that it will incur

8 costs in monitoring the case.

9        Ultimately, relator believes she should prevail.  However, if the Court is inclined to agree

10 with the government's position, that even if all of the evidence described above was established at

11 a hearing the government would still be entitled to dismissal, there would be no reason for an

12 evidentiary hearing.[16]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

_____

27 [16]      Ultimately, if the government's motion is granted, any dismissal should be with prejudice
to the United States given the basis for its motion.

28

RELATOR'S SUPPLEMENTAL BRIEF

1

Dated: December 14, 2017

2

By:  /s/ Jonathan W. Ferris

3
       J. Nelson Thomas
       Michael J. Lingle

4
       Jonathan W. Ferris
       Annette M. Gifford

5
       THOMAS & SOLOMON LLP
       693 East Avenue

6
       Rochester, NY  14607
       Telephone:  585-272-0540

7
       Facsimile:  585-272-0574

8

9
       Sanford Jay Rosen
       Van Swearingen

10
       ROSEN BIEN GALVAN &
       GRUNFELD LLP

11
       50 Fremont Street
       19th Floor

12
       San Francisco, CA 94105

13
       Counsel for Relator

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RELATOR'S SUPPLEMENTAL BRIEF
16-CV-02120-EMC