| | |
|---|---|
| 1 | J. NELSON THOMAS (admitted *pro hac vice*) |
| 2 | JONATHAN W. FERRIS (admitted *pro hac vice*) |
|   | MICHAEL J. LINGLE (admitted *pro hac vice*) |
| 3 | ANNETTE M. GIFFORD - 270777 |
|   | THOMAS & SOLOMON LLP |
| 4 | 693 East Avenue |
|   | Rochester, New York 14607 |
| 5 | Telephone: (585) 272-0540 |
| 6 | Email: nthomas@theemploymentattorneys.com |
|   | jferris@theemploymentattorneys.com |
| 7 | nthomas@theemploymentattorneys.com |
|   | amgifford@gmail.com |
| 8 | |
| 9 | SANFORD JAY ROSEN – 062566 |
|   | VAN SWEARINGEN – 259809 |
| 10 | ROSEN BIEN GALVAN & GRUNFELD LLP |
|    | 50 Fremont Street, 19th Floor |
| 11 | San Francisco, California 94105-2235 |
|    | Telephone: (415) 433-6830 |
| 12 | Facsimile: (415) 433-7104 |
|    | Email: srosen@rbgg.com |
| 13 | vswearingen@rbgg.com |
| 14 | |
|    | Attorneys for |
| 15 | RELATOR GWEN THROWER |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. GWEN THROWER, | Case No. 16-CV-02120-EMC |
| Plaintiff, | **DECLARATION OF WILLIAM LEPOWSKY** |
| v. | Judge: Hon. Edward M. Chen |
| ACADEMY MORTGAGE CORPORATION, | |
| Defendant. | |

I, William Lepowsky, under penalty of perjury, declare:

1. I have personal knowledge of the facts set forth herein (except where indicated upon information and belief) and if called as a witness, could and would testify competently thereto.

2. I have been a statistical consultant and expert legal witness since 1989. I am also currently a part-time statistics instructor at Laney College in Oakland, California. I was previously a full-time statistics and mathematics instructor at Laney College from 1969 until 2011. A true and correct copy of my curriculum vitae is attached hereto as Exhibit 1.

3. I received a Bachelor's degree in Mathematics from Harvard College in 1967. From the University of California, Berkeley, I received a Masters degree in Mathematics in 1968, a Masters degree in Statistics in 1976, and a Candidate in Philosophy degree in Statistics in 1981

4. I have qualified as an expert in the area of statistical analysis and have testified in age discrimination cases in the United States District Court, Northern District of California, and in the Superior Courts of Alameda County, Santa Clara County, Los Angeles County and the City and County of San Francisco, as well as in a gender discrimination case in the Superior Court, Stanislaus County; in a race discrimination case in the Superior Court of the City and County of San Francisco; in a wrongful termination case in the Superior Court of Los Angeles County; and in a national origin discrimination case in the United States District Court, Eastern District of California.

5. I have been retained by the law firm of Thomas & Solomon to perform statistical analyses of the data in this case.

6. I have reviewed the Neighborhood Watch data for Academy Mortgage Corporation for the performance period of February 1, 2015 to January 31, 2017, which I understand is Docket No. 27-1 of this action.

7. Nationwide there were 2,035,013 originations, out of which there were 23,483 seriously delinquent and 451 claims, for a total of 23,934 originations identified as "Seriously Delinquent and Claims," a term which will be abbreviated hereinafter as "SDC." This total

number of SDC originations (23,934) is 1.18% of all 2,035,013 originations.

8. For Academy Mortgage Corporation [hereinafter, "Academy"], there were 25,530 originations, out of which there were 378 seriously delinquent and 10 claims, for a total of 388 SDCs. This is 1.52% of all 25,530 Academy originations.

9. The following remarks analyze the disparity between the 1.52% SDC figure for Academy originations and the 1.18% SDC figure for nationwide originations.

10. Note first that dividing the Academy value, 1.52%, by the nationwide value, 1.18%, yields the ratio 1.29. Thus the Academy value is 129% of the nationwide value. Phrased another way, Academy's SDC origination rate is 29% greater than the nationwide rate.

11. I will now analyze, using two different statistical methodologies, the extent of the disparity between the nationwide SDC percentage, 1.52%, and Academy's SDC percentage, 1.18%.

12. The Academy originations, of which there were 25,530, are a selection of the nationwide originations, of which there were 2,035,013. The first methodological approach I will use considers the following questions: When a sample of size 25,530 is selected from a population that is very much larger, what is the expected number of SDC originations to be found in the sample, given that 1.18% is the population percentage? And does the actual number of SDC originations, 388, that are observed in the sample fall within the expected range?

13. Note that the term "expected" has two distinct meanings. The first refers to one single value (called the "expected value" or the "expected number") and the second refers to a range of values that are expected.

14. An example will help explain this distinction. Consider a very large bowl of marbles, identical except for their color. Suppose that there are many thousands of marbles in the bowl, 20% of which are red. Suppose that 400 marbles are randomly selected from this bowl. What is the expected number of red marbles in the sample?

15. Because 20% of the marbles in the bowl are red, the "expected number" of red marbles in the sample is 20% of 400, which is 80. Therefore, we "expect" that the sample will

DECLARATION OF WILLIAM LEPOWSKY

contain 80 red marbles.

16. However, obtaining precisely 80 red marbles in the sample -- no more, no less -- would actually be rather unexpected, because achieving the one precise value that is "expected" is fairly unlikely. There are values near 80 forming a range that would be reasonable to expect, and of course there are also values far from 80 that would not be reasonable to expect. Obtaining 82 reds (which is 20.5% of 400) or 78 reds (which is 19.5% of 400), for example, would be within the expected range, but obtaining 120 or 40 reds (that is, 30% or 10% of 400) would not be.

17. To determine the range of values that is reasonably expected, we use the fact that if the marbles were drawn randomly from the population, then the number of red marbles in the sample could be modeled by what is called a binomial distribution. Note that this methodology is presented in complete detail, together the relevant formulas, in footnote 17 of *Castaneda v. Partida*, 430 U.S. 482 (1977). That footnote begins: "If the jurors were drawn randomly from the general population, then the number of Mexican-Americans in the sample could be modeled by a binomial distribution."

18. The standard deviation of the number of red marbles in the sample in our example, using the formula explained in *Castaneda*, can be computed to be equal to 8. [This is the square root of the product of 400 (the sample size), 20% (the red percentage), and 80% (the non-red percentage). The product of 400 times 20% times 80% equals 64, and the square root of 64 is 8.]

19. When the sample size is sufficiently large, as it is in this example, the binomial distribution has approximately the shape of what is called a normal distribution (often referred to as the bell-shaped curve). In a normal distribution, 95% of the distribution lies within 1.96 standard deviations in either direction from the mean. (The mean is the center, that is, the expected value.) Also, 99% lies within 2.58 standard deviations from the mean; 99.9% lies within 3.29 standard deviations from the mean; and 99.99% lies within 3.89 standard deviations from the mean. Multiplying these values by the size of one standard deviation (which is 8 in this case) yields the following results.

20. There is a 95% probability that the number of red marbles in the sample will lie in

the interval 80 plus or minus 1.96 x 8, which extends from about 65 to 95 red marbles.

21. There is a 99% probability that the number of red marbles in the sample will lie in the interval 80 plus or minus 2.58 x 8, which extends from about 60 to 100 red marbles.

22. There is a 99.9% probability that the number of red marbles in the sample will lie in the interval 80 plus or minus 3.29 x 8, which extends from about 54 to 106 red marbles.

23. There is a 99.99% probability that the number of red marbles in the sample will lie in the interval 80 plus or minus 3.89 x 8, which extends from about 49 to 111 red marbles.

24. It follows that obtaining, for example, 120 reds or 40 reds in the sample would be well outside of the range of values that occurs 99.99% of the time and would therefore be considered to be distinctly unusual and unexpected. Indeed, those values (120 and 40) differ from the expected value (80) by a difference of 40, which is 5 standard deviations.

25. I will now present a second example that is similar to the marble example. Consider a fair coin that is tossed 100 times. (A fair coin is one with a 50% probability of landing heads.) What is the expected number of times that the coin will land heads?

26. Note that these 100 tosses of the coin can be thought of as a sample from the entire population of tosses that are possible with this coin (which of course consists of a very large -- effectively infinite -- collection of possible tosses that could be made).

27. Because the coin is a fair coin, the "expected number" of tosses that land heads is 50% of 100, which is 50. Therefore, we "expect" 50 heads.

28. However, obtaining precisely 50 heads -- no more, no less -- would actually be rather unexpected, because achieving the one precise value that is "expected" is fairly unlikely. There are values near 50 forming a range that would be reasonable to expect, and of course there are also values far from 50 that would not be reasonable to expect. Obtaining 52 heads or 48 heads, for example, would be within the expected range, but obtaining 75 or 25 heads (that is, 75% or 25% of the 100 tosses) would not be.

29. To determine the range of values that is reasonably expected, we use the fact that if the tosses are random, then the number of heads could be modeled by a binomial distribution.

30. The standard deviation of the number of heads can be computed to be equal to 5. [This is the square root of the product of 100 (the number of tosses), 50% (the probability of heads), and 50% (the probability of tails). The product of 100 times 50% times 50% equals 25, and the square root of 25 is 5.]

31. When the sample size is sufficiently large, as it is in this example, the binomial distribution has approximately the shape of a normal distribution. Recall that in a normal distribution, 95% of the distribution lies within 1.96 standard deviations from the mean; 99% lies within 2.58 standard deviations from the mean; 99.9% lies within 3.29 standard deviations from the mean; and 99.99% lies within 3.89 standard deviations from the mean. Multiplying these values by the size of one standard deviation (which is 5 in this case) yields the following results.

32. There is a 95% probability that the number of heads will lie in the interval 50 plus or minus 1.96 x 5, which extends from about 41 to 59 heads.

33. There is a 99% probability that the number of heads will lie in the interval 50 plus or minus 2.58 x 5, which extends from about 38 to 62 heads.

34. There is a 99.9% probability that the number of heads will lie in the interval 50 plus or minus 3.29 x 5, which extends from about 34 to 66 heads.

35. There is a 99.99% probability that the number of heads will lie in the interval 50 plus or minus 3.89 x 5, which extends from about 31 to 69 heads.

36. It follows that obtaining 75 heads, for example, would be well outside of the range of values that occurs 99.99% of the time and would therefore be considered to be distinctly unusual and unexpected. Indeed, this value (75) differ from the expected value (50) by a difference of 25, which is five standard deviations.

37. Furthermore, a detailed calculation shows that the probability of a fair coin landing heads 75 or more times is about 1 in 3,500,000 (or about 0.0000282%). This value is called the "p-value" and because it is less than 5% (indeed, it is much less than 5%), the results are said to be statistically significant.

38. To summarize, if 100 tosses of a coin yield 75 heads, then the disparity between

that result and what would have been expected from a fair coin is statistically significant. Measured using the number of standard deviations as a yardstick, the disparity is five standard deviations. The probability of obtaining at least that many heads in 100 tosses of a fair coin is about 1 in 3,500,000, which is very small. This is evidence that getting 75 heads out of 100 tosses is not consistent with random tosses of a fair coin.

39. I will return now to the questions posed above: When a sample of size 25,530 is selected from a population that is very much larger, what is the expected number of SDC originations to be found in the sample, given that 1.18% is the population percentage? And does the actual number of SDC originations that is observed in the sample (388) fall within the expected range?

40. Mirroring the computations in the example of the red marbles, I computed the following.

41. The precise number of SDC originations expected is 1.18% of 25,530, which is 300.26. (Note that 1.18% is a rounded figure; the more precise value is 1.17611%, which equals 23,934 divided by 2,035,013.)

42. The standard deviation can be computed (using the formula above) to be equal to 17.23.

43. Therefore, there is a 95% probability that the number of SDC originations in the sample would be in the range from about 267 to 334. Also, there is a 99% probability that it would be in the range from about 256 to 344; there is a 99.9% probability that it would be in the range from about 244 to 357; and there is a 99.99% probability that it would be in the range from about 233 to 367. (These computations involve forming a range around the expected value, 300.26, by multiplying the standard deviation, 17.23, by the appropriate number of standard deviations: 1.96; 2.58; 3.29; and 3.89.)

44. However, the actual number of Academy's SDC originations was 388. Because 388 is well outside the range of values that occurs with probability 99.99% (233 to 367), it is distinctly unusual and unexpected.

45. The disparity in Academy's SDC originations -- 388 actually observed vs. 300.26 expected -- is 87.74, and dividing by one standard deviation (17.23) shows that Academy's value is equivalent to 5.09 standard deviations of disparity. The U.S. Supreme Court, in footnote 17 in *Castaneda* cited above, asserted that "... if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." The fact that the difference in this case, 5.09 standard deviations, exceeds "two or three standard deviations" provides additional evidence of the substantial difference between Academy's rate of SDC originations and the nationwide rate.

46. The computations above concerning the whole number count of Academy's SDC originations can be presented instead using percentages. The methodology for percentages mimics that presented above using counts and proceeds are follows.

47. The percentage of SDC originations expected is 1.18%. (Note that 1.18% is a rounded figure; the more precise value is 1.17611%.)

48. The standard deviation of the percentage can be computed to be 0.0674%. (The standard deviation of the percentage is computed by first determining the standard deviation of the count, computed above to be 17.23, and then dividing by the sample size, which in this case is 25,530.)

49. Therefore, creating intervals around the expected percentage 1.18%, I computed that there is a 95% probability that Academy's percentage of SDC originations would be in the range from about 1.04% to 1.31%; there is a 99% probability that it would be in the range from about 1.00% to 1.35%; there is a 99.9% probability that it would be in the range from about 0.95% to 1.40%; and there is a 99.99% probability that it would be in the range from about 0.91% to 1.44%.

50. However, Academy's actual percentage of SDC originations is 1.52%. Because 1.52% is well outside the range of values that occurs with probability 99.99% (0.91% to 1.44%), it is distinctly unusual and unexpected. The disparity in Academy's percentage of SDC originations

-- 1.52% actually observed vs. 1.17% expected -- is 0.34%. (Note that 1.52% minus 1.17% is 0.35%, but when more decimal places are used to achieve greater precision, a more accurate value is determined to be 0.3437%, which rounds off to 0.34%.) Dividing the disparity in percentages by one standard deviation (0.0674%) shows that this equals 5.09 standard deviations of disparity, precisely the same number of standard deviations as was computed above when counts, not percentages, were analyzed.

51. The second methodological approach I will use to analyze the disparity between the Academy's SDC rate (1.52%) and the nationwide rate (1.18%) will be to determine the actual level of surprise at obtaining such a large disparity. That level of surprise is called the "p-value." It is equal to the probability of obtaining such a large deviation from what would have been expected if the Academy originations had been selected at random from the nationwide originations (and therefore would have mirrored the nationwide rate for SDC originations).

52. The Supreme Court, in footnote 17 of *Castaneda* referenced above, states: "The 11-year data here reflect a difference between the expected and observed number of Mexican-Americans of approximately 29 standard deviations. A detailed calculation reveals that the likelihood that such a substantial departure from the expected value would occur by chance is less than 1 in $10^{140}$." The corresponding result in the present case is as follows.

53. The Academy data, as computed above, reflects a difference between the expected and observed number of SDC originations of 5.09 standard deviations. Using the normal distribution to do the detailed calculation reveals that the probability that such a substantial departure from the expected value would occur by chance is about 1 in 5,700,000 (or about 0.0000176%). This value is the p-value, and it applies equally to the disparity in Academy's count of SDC originations (388 actually observed vs. 300.2 expected) as well as to the disparity in Academy's percentage of SDC originations (1.52% actually observed vs. 1.18% expected).

54. When the p-value is less than 5%, the results are commonly said to be statistically significant.

55. Because the p-value equals 0.0000176%, therefore there is a statistically significant

disparity between Academy's values for SDC originations that actually occurred (count: 388; percentage: 1.52%) and the corresponding values that would have been expected based on the nationwide data (count: 300.2; percentage: 1.18%).

56. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed at Berkeley, CA.

Executed this 16th day of May 2018 in Berkeley, CA.

*William Lepowsky*
_____
William Lepowsky

Exhibit 1

**William L. Lepowsky**     *Statistical Consultant*
544 Santa Clara Avenue, Berkeley, CA 94707 • E-mail: stats4u@pacbell.net
Cell & Voice Mail: (510) 384-5082 • Telephone & Fax: (510) 524-2101

# CURRICULUM VITAE
January 1, 2018

**EDUCATION**   Cand. Phil. (Candidate in Philosophy), U. C. Berkeley, August, 1981.
Department: Statistics  [Emphasis: Theoretical Statistics]

M.A., U. C. Berkeley, June, 1976.
Department: Statistics  [Emphasis: Applied Statistics]

Course work included:
Linear models (regression and analysis of variance), discrete data analysis, non-parametric methods, multivariate analysis, advanced modeling techniques, advanced theory of estimation and testing, advanced probability theory, directed theoretical research, and statistical consulting.

Studied under:
Prof. Jerzy Neyman (founder of the U.C. Berkeley Statistical Laboratory; a founding father of modern statistical theory; co-originator of the theory of confidence intervals and hypothesis testing);
Prof. Erich Lehmann (a leading authority on the theory of estimation and testing and on non-parametric methods);
Prof. Elizabeth Scott (head of the Panel on Skin Cancer of the National Academy of Sciences); and
Prof. Juliet Shaffer (director of the Consulting Service of the U.C. Berkeley Department of Statistics).

M.A., U. C. Berkeley, August, 1968.
Department: Mathematics

B.A., Harvard College, June, 1967.
Major: Mathematics  [Graduated *summa cum laude*]

**EXPERIENCE**  Statistical Consultant (Legal): Expert witness and consultant. (1989 to present).

Instructor of Mathematics and Statistics: Laney College, Oakland, CA. Teach statistics, calculus, algebra, arithmetic, etc. to adults. (1969 to present. Retired as full-time instructor in 2011; still teaching part-time.)
- Mathematics Department Chair. (2000 - 02).
- Supervisor of Mathematics Laboratory. (1987 - 99).
- Mathematics Department Chair/Schedule Coordinator. (1979 - 80).

Statistical Consultant (Other): Analyze data and offer statistical advice to researchers in health, education, psychology, science, etc. (Occasional, 1976 to present; currently infrequent).

Instructor: Oakland Schools Mathematics In-Service Consortium. Trained elementary school teachers in: probability and statistics, (Summers: 1987 - 90); geometry and measurement, (Summer, 1986).

Presenter of talk on statistical evidence of discrimination: California Employment Lawyers Association Annual Conference, Pasadena, CA. (October 4, 2009).

Presenter of talk on statistics in employment discrimination cases: San Francisco Trial Lawyers Association Employment Law Luncheon Meeting, San Francisco, CA. (June 9, 1998).

Workshop Leader on Statistics: American Medical Writers Association Western Regional Conference, Asilomar Conference Center, Pacific Grove, CA. (March, 1986).

Curriculum Consultant: Vista College, Berkeley, CA. Helped develop a statistics curriculum for older working adults. (1989).

Statistical Software Designer: University of California, Berkeley, CA. Designed a computer program to determine statistically the impact of ozone depletion on skin cancer rates. (September, 1979 - June, 1980).

Compiler and Editor of Lecture Notes on statistical estimation theory. (1977).

Statistical Consultant to the Panel on Skin Cancer of the National Academy of Sciences. (Fall, 1976 - Fall, 1977).

Statistician: Lawrence Livermore Laboratory, Livermore, CA. Assisted senior researchers in designing experiments and analyzing results. (Summer, 1976).

Actuarial Trainee: Beneficial Standard Life Insurance Company, Los Angeles, CA. Analyzed mortality tables and insurance rates. (Summer, 1965).

| | |
|---|---|
| **FELLOWSHIPS HONORS, AND AWARDS** | Teaching Excellence Award, California Mathematics Council, Community Colleges. (2000).

Principal Investigator/Project Director, National Science Foundation Grant: "Instituting Calculus Reform: A Community College-State University Consortium Model." (1994 - 96).

Professional Development Grant for statistics curriculum development, Laney College. (1989).

Science Faculty Professional Development Fellowship for enhancement of instruction in statistics, U. C. Berkeley, awarded by the National Science Foundation. (1980).

National Science Foundation Graduate Fellowship, U. C. Berkeley. (1967 - 68).

Harvard College Scholarship, Harvard College. (1964 - 67).

National Merit Scholar, Harvard College. (1963 - 67).

National Honor Society Honorary Scholarship, Harvard College. (1963). |
| **MEMBERSHIPS** | American Statistical Association

California Mathematics Council for Community Colleges

Board of Directors, California Mathematics Council for Community Colleges. (1974 - 75). |

| | |
|---|---|
| **PUBLICATIONS** | "Statistical Evidence of Discrimination: Roulette, Ping-Pong Balls, M&Ms and P-Values," in 2008 CELA Annual Conference Materials (October 4, 2008), California Employment Lawyers Association |

"'Why Bring In a Statistician?' Examples of Statistical Analyses in Employment Discrimination Cases," in Employment Law (June 9, 1998), San Francisco Trial Lawyers Association

Statistics in Action (2009)

Five articles in mathematics teaching journals:

    "The Subtle Scales of Justice," Mathematics Teacher. (May, 1976).

    "Path Tracing and Vote Counting," Mathematics Teacher. (Jan., 1976).

    "Homemade Models of Pathological Surfaces," Mathematics Association of Two-Year Colleges Journal. (Spring, 1975).

    "The Area of a Parallelogram is the Product of its Sides," Mathematics Teacher. (May, 1974).

    "The Total Angular Deficiency of Polyhedra," Mathematics Teacher. (December, 1973).

**ACADEMIC HONORS**  One of only two mathematics majors in my Harvard class to graduate *summa cum laude*. (1967).

Phi Beta Kappa Honorary Society, Harvard College. (1967).

Dean's List for scholastic achievement each academic year, Harvard College. (1963 - 67).

Ranked in the top ten nationwide in the intercollegiate William Lowell Putnam Mathematics Competition. (1967).

Tied for first place nationwide in the General Mathematics Examination sponsored by the Society of Actuaries. (1964).

Placed first out of 200,000 students nationwide in the High School Mathematics Examination sponsored by the Mathematics Association of America and the Society of Actuaries. (1963).

Placed first in the New York City high school interscholastic mathematics competition. (1963).

Placed first in the New York City junior high school interscholastic mathematics competition. (1961).