J. NELSON THOMAS (admitted *pro hac vice*)
JONATHAN W. FERRIS (admitted *pro hac vice*)
MICHAEL J. LINGLE (admitted *pro hac vice*)
ANNETTE M. GIFFORD - 270777
THOMAS & SOLOMON LLP
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
Email:          nthomas@theemploymentattorneys.com
                jferris@theemploymentattorneys.com
                nthomas@theemploymentattorneys.com
                amgifford@gmail.com

SANFORD JAY ROSEN – 062566
VAN SWEARINGEN – 259809
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104
Email:       srosen@rbgg.com
             vswearingen@rbgg.com

Attorneys for
RELATOR GWEN THROWER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. GWEN THROWER,<br><br>Plaintiff,<br><br>v.<br><br>ACADEMY MORTGAGE CORPORATION,<br><br>Defendant. | Case No. 16-CV-02120-EMC<br><br>**DECLARTION OF JONATHAN W. FERRIS**<br><br>Judge:   Hon. Edward M. Chen |

DECLARATION OF JONATHAN W. FERRIS

I, Jonathan W. Ferris, under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief:

1. I am an attorney with the law firm of Thomas & Solomon LLP which represents the Relator, Gwen Thrower, in this action.

2. I make this declaration based upon my personal knowledge and information.

**HUD FOIA Request**

3. Relator's counsel submitted a Freedom of Information Act ("FOIA) request to HUD in the fall of 2017 seeking claims data for certain lenders that had settled or been (or currently are) involved in False Claims Act cases or investigations involving FHA mortgage origination. Relator's counsel sought data related to claims values, early payment defaults, and claims numbers.

4. On April 30, 2018, Relator's counsel received a partial response to the request and was provided electronic information regarding the request.

5. A copy of the data spreadsheets that was provided to Relator's counsel for these lenders is attached hereto as **Exhibit A**.

6. After receiving the data, I reviewed and analyzed the data for these lenders.

7. Specifically, I analyzed the claims data for these lenders for the time period of 2010 to 2017. Relator's counsel chose this time period as it would represent approximately the proper lookback period given the FCA's six-year statute of limitations period and that the complaint was filed in April 2016.

8. Using this time period, I analyzed the claims data (e.g., amount paid to each lender as FHA insurance claims) by calculating the sum of partial and full claims. A partial claim is when FHA pays the difference between the sales price and the outstanding principal balance owed (e.g., a short sale). A full claim is when FHA takes title and possession of the property to eventually sell it.

9. Conducting this analysis, I determined how much each lender had in claims for this time period.

**Analysis of the Lenders**

10. Additionally, for each lender, I reviewed information regarding the status of settlements, litigation, or investigations.

11. The Government filed a False Claims Act case against Quicken Mortgage. Additionally, the Government intervened in a FCA case against Guild Mortgage. These are both FHA mortgage fraud actions.

12. Additionally, SEC filings for parent corporations of Primelending and Eagle Home Mortgage indicate that they are being investigated related to their FHA mortgage lending practices.

13. Additionally, a review of the docket in the Carrington Mortgage Services, Cherry Creek Mortgage, and Bank of the West cases indicates that the Government declined to intervene in those cases.

14. I also determined that there had been settlements with Wells Fargo, Bank of America, Flagstar Bank, Freedom Mortgage, U.S. Bank, Fifth Third, Franklin American, JP Morgan Chase, Primary Residential Mortgage Inc., Prospect Mortgage, United Shore Financial Lending Services, Suntrust, Regions Bank, M&T Bank, SecurityNational Mortgage Group, Branch Banking & Trust Company, Residential Home Funding Corp., PHH Home Loans, IBERIABANK, and First American Mortgage.

15. For the cases that had settled, I also reviewed publicly available information and determined how much each lender paid regarding its FHA lending practices.

16. For each of the lenders, I also determined whether the government had pursued the case (e.g., by settlement, investigation, or commencing an action) and whether the Government had moved to dismiss the action.

17. A summary of this information, including the value of the claims from 2010 to 2017, whether the government pursued the case (whether through its own lawsuit, enforcement action, or intervening in an action), and the settlement value (if settled) is attached hereto as **Exhibit B.**

18. As demonstrated by **Exhibit B**, Academy was paid $157,073,010 for claims from 2010 to 2017.

19. In comparison, the United States has settled numerous other actions related to FHA mortgage fraud for lenders with smaller claims paid over that time period than Academy: United Shore Financial Lending ($155,272,576 in claims from 2010 to 2017, with $48 million settlement); Suntrust ($140,303,395 in claims, $418 million for FHA settlement); Regions Bank ($109,119,153 in claims, $52.4 million settlement); M&T Bank ($101,347,243 in claims; $64 million settlement); SecurityNational Mortgage Group ($98,713,140 in claims, $5 million settlement); Branch Banking & Trust Company ($96,315,572 in claims, $83 million settlement); Residential Home Funding Corp. ($78,666,700 in claims, $1.67 million settlement); PHH Home Loans ($78,541,964 in claims, $65 million FHA settlement); IBERIABANK ($58,836,127 in claims, $11.6 million settlement); First American Mortgage ($2,125,633 in claims, $1.025 million settlement).

20. Of these 28 actions, eleven have been brought by qui tam relators on behalf of the United States. Of those cases and excluding the present case, the United States has intervened in or settled all seven cases in which the value of FHA claims from 2010 to 2017 exceeded $58 million (the $58,836,127 amount in IBERIABANK).[1]

21. Conversely, the Government has declined to intervene in the qui tam actions against Carrington Mortgage, Cherry Creek Mortgage, and Bank of the West, all of which have claims below $58 million during the period 2010 to 2017.

22. In other words, the Government has a clear claims amount cutoff for when it pursues qui tam cases involving FHA mortgage fraud: a lender must have at least $58 million in claims from 2010 to 2017.

23. Given that Academy's claims against the Government exceed $150,000,000, and that the Government has deemed it **worth its own resources** to actively pursue every case with lenders with claims over $58 million (specifically lenders with claims rates of $58 million, $78 million, $96 million, $98 million, $101 million, $109 million, $126 million, $140 million, $155 million), it is

---

[1] The Government has settled qui tam relator-initiated actions involving Bank of America, Fifth Third, JP Morgan, M&T Bank, PHH Home Loans, and IBERIABANK. Additionally, the Government has intervened in and is pursuing a case against Guild Mortgage.

arbitrary and improper for the Government to claim here that Academy, with a default rate far worse than those lenders, and with claims in excess of $150 million, is "too small" not only to decline to litigate, but is too small to simply monitor the litigation carried out by others.

**Academy's Claims Numbers**

24. As discussed above, Academy was paid $157,073,010 for claims from 2010 to 2017.

25. According to HUD's 2016 Annual Report to Congress, the average value of a HUD loan is approximately $195,000.

26. Given that Academy was paid $157,073,010 for claims from 2010 to 2017, this would equate to approximately 806 claims over that period of time.

**The Government's Claim that Academy is "Too Small" Does Not Comport with its Admissions that it Targets the Largest FHA Lenders**

27. At the time Relator filed her complaint, Academy was the fourth largest lender in terms of originations based on HUD's Neighborhood Watch 2016Q2 data for the prior two years.

28. It is surprising here that Government now claims Academy somehow is too small and that any case against it needs to be dismissed. According to a HUD 2015 Enterprise Roadmap, attached hereto as **Exhibit C**, the Government pursued "investigations into FHA loan origination and underwriting by twenty of the largest FHA lenders."

29. The Government has even referred to these sets of enforcement efforts as "the Big Lender Initiative." See *United States v. Quicken Loans*, No. 1:16-cv-14050 (E.D. Mich.), Dkt. No. 69 at 7.

30. And in a case related to the Government's pursuit of Quicken Loans, Quicken states "the DOJ informed the company that it was investigating all of the largest FHA lenders in the United States, rather than investigating Quicken Loans because it suspected wrongdoing." *See Quicken Loans v. United States*, No. 2:15-cv-11408 (E.D. Mich.), Dkt. No. 1 at ¶ 2. (Significantly, the Government has vigorously asserted that any dismissal should only be with prejudice to the Relator so the Government would be free to prosecute Academy.)

**The Scope of an FCA case and the Government's Investigative Powers**

31.     The recovery in an FCA case is not limited to the relator's personal knowledge, the location the relator worked, or the time period of relator's employment. *See e.g., U.S. ex rel. Bozzelli v. PHH Mortgage Corp.*, No. 13-cv-3084 (E.D.N.Y.) (relator who worked for defendant from 2008 to June 2011, but settlement covered conduct period was from January 1, 2006 and December 31, 2011); *United States ex rel. Mann et al. v. Fifth Third Bancorp*, No. 11-cv-4499 (S.D.N.Y.) (relator worked for defendant from late 2004 to September 2008, with settlement involving loans originated between 2003 and 2013); *United States ex rel. Edwards v. JPMorgan Chase Bank*, No. 13-cv-220 (S.D.N.Y.) (where relator only worked for defendant from 2003 to 2008, settlement including loans submitted for FHA loans from January 2002 to the signing of the settlement agreement in February 2014); *U.S. ex rel. Kelschenbach v. M&T Bank*, No. 13-cv-280 (W.D.N.Y.) (*qui tam* complaint filed in March 2013 by relator working in Buffalo, New York, with settlement involving mortgages submitted for insurance between January 1, 2006 and December 31, 2011).

32.     In order to investigate the full scope of the allegations, the Government has enormous powers. The Government is free to (and almost invariably does) seek repeated extensions to investigate the allegations in the complaint. 31 U.S.C. § 3730(b)(3). The Government also has all the enormous investigatory tools given to it to investigate complaints (including teams of attorneys, investigators, departmental information and powers, subpoenas of documents and witnesses, electronic surveillance). *See* Jeffrey L. Bornstein, Leanne E. Hartmann, Suzan Onel, Michael D. Ricciuti, & Mark Rush, Paul W. Shaw, Joseph A. Valenti, <u>Despite Setbacks, DOJ's Criminal Enforcement of the False Claims Act and Related Statutes Marches on Federal Contractors and Their Employees Must Remain Vigilant</u>, Fed. Law., May 2013, at 54, 56 (noting that in criminal fraud cases, Government may use investigatory tactics such as wiretaps, cooperating witnesses, search warrants, and undercover sting operations). *See also Docket No*. 9 p. 3 at 7-9, 11-12 (noting in this case that could include "assembling a team of investigators and attorneys from the U.S. Department of Justice, the U.S. Attorney's Office, and the U.S Department of Housing and Urban

Development;" and "subpoenaing documents from the Defendant and identifying and interviewing additional witnesses.").

**The Government's Proposal to Dismiss and Re-file the Action Was Not Viable**

33. During Relator's counsel's conferral with the Government in March and April 2017, Relator's counsel repeatedly told the Government that dismissing, but then re-filing the complaint, was not a viable option.

34. First, if Relator dismissed her case, but another action was currently pending against the same defendant, a subsequent action by the Relator could be barred by the FCA's first-to-file bar.

35. Second, if the defendant's conduct had been publicly disclosed during the pendency of the seal, a new action could be barred under the FCA's public disclosure bar.

36. Third, dismissal would also cause statute of limitations problems as Relator would lose approximately one year of claims.

**Relator's Original Complaint**

37. Relator's original complaint alleged that: Academy's "management instituted and encouraged policies that led underwriters to break HUD rules and to approve ineligible loans" (Complaint ¶¶ 5, 95, 103-104); specifically identified Academy's fraudulent "policies and practices" that created the fraud and provided representative examples of the fraudulent "systemic practices and procedures followed by Academy" (Complaint ¶¶ 6, 10-12, 160); provided examples of how Academy "established a culture that valued getting a loan approved and endorsed for FHA insurance over complying with FHA's rules" (Complaint ¶¶ 7, 96-97, 101-102, 105); described how Academy knowingly submitted false certifications over a number of years to the Government that the company was in compliance with FHA requirements (Complaint ¶¶ 6, 75-82, 92, 94, 99, 162-164); explained that Academy instructed its underwriting staff that loans should never be declined (Complaint ¶¶ 8, 97-99); described how Academy "taught and counseled underwriters on several mechanisms designed to falsely make loans eligible for FHA insurance," and then identified those tactics (Complaint ¶¶ 9, 93, 99, 106-112, 116-151); that these policies and practices resulted in hundreds

of improperly underwritten loans to be endorsed for FHA insurance and millions of dollars in losses to HUD (Complaint ¶¶ 13-14); and that "Academy's senior management was aware of the management exception process, and was often involved in the decision of whether to grant an exception requested by the underwriter." (Complaint ¶ 100).

**Relator's Additional Investigation**

38.     Once the seal was lifted, defendant moved to dismiss the case.

39.     Following that, Relator's counsel conducted additional investigation. Despite being a seven-attorney firm, Relator's counsel gathered information from 17 other employees and former managers of Academy from around the country verifying Academy's corporate fraudulent scheme in less than two months.

40.     This included further support of Academy's fraudulent underwriting policies at approximately 14 of Academy's branches across the United States, including in Arizona, South Carolina, Oregon, Florida, Texas, Colorado, and Washington.

**Relator Provides Detailed Information to The Government Prior to Filing the Amended Complaint**

41.     Prior to filing the amended complaint, as promised, Relator provided detailed information about the amended complaint to the Government.

42.     Specifically, Relator's counsel provided the Government with letters dated April 17, 2017 and April 24, 2018 that provided detailed information on the factual allegations that would form the basis of the amended complaint.

43.     Prior to filing the amended complaint, Relator also provided a draft copy to the Government. The Government did not make any suggestion that it would like an extension of the deadline for Relator to file her amended complaint.

**Relator's Amended Complaint**

44.     The amended complaint alleged the same fraud against the same defendants and simply provided more detail amplifying the earlier allegations.

45. For example, the amended complaint added language concerning the mandatory government certifications (Amended Complaint ¶¶ 114-150). In discussing improper pressure applied by Academy set forth in the original complaint (Complaint ¶¶ 96-105), the amended complaint added additional regulatory language on the issue; cited more details from the Relator's interaction with defendants; cited testimony from employees at other branches confirming these practices; and provided more detail on the incentives and disincentives used by Academy referenced in the original complaint (Amended Complaint ¶¶ 179-322). Similarly, for the allegations in the original complaint regarding manipulation of the AUS/TOTAL System (Complaint ¶¶ 106-115), the amended complaint added additional regulatory language, additional examples from specific files, and testimony from an employee-witness in Florida confirming the same practices occurred there (Amended Complaint ¶¶ 323-348). As to the allegations from the original complaint that Academy had a policy of fraudulently calculating the borrower's income (Complaint ¶¶ 116-127), the amended complaint added additional regulatory language, provided specific loan files as examples, and added additional comments made by Academy management is support of the fraudulent policy. As to the allegations in the original complaint that Academy had a policy of miscalculating debt obligations (Complaint ¶¶ 128-136), the amended complaint added additional regulatory language, and provided additional comments from Academy management in support of this policy (Complaint ¶¶ 363-379). As to Academy's policy to fraudulently document files (Complaint ¶¶ 137-144), the amended complaint added additional regulatory language and specific statements from Academy management in support of this policy (Amended Complaint ¶¶ 380-393). As to the allegation in the original complaint that Academy was deliberately destroying documentation that the government required be maintained (Complaint ¶¶ 145-151), the amended complaint added additional regulatory language, more specifics about the Relator's interaction with Academy, more details on how Academy conducted the fraud, and confirming testimony from another Academy location (Amended Complaint ¶¶ 394-410). As to the allegations in the original complaint that Academy ignored audit findings and did not adopt proper quality control mechanisms (Complaint ¶¶ 152-

159), the amended complaint added additional regulatory language more details of interactions between Realtor and Academy in support of this fraud (Amended Complaint ¶¶ 411-434).

Executed this 17th day of May 2018 in Rochester, New York.

/s/ Jonathan W. Ferris
Jonathan W. Ferris