UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | Case No. 16-cv-02120-EMC |
| Plaintiffs, | |
| v. | **ORDER DENYING DEFENDANT'S MOTION TO TRANSFER VENUE AND MOTION TO DISMISS** |
| ACADEMY MORTGAGE CORPORATIONN, | Docket Nos. 48, 50 |
| Defendant. | |

In this False Claims Act *qui tam* suit, Gwen Thrower ("Relator") alleges that Academy Mortgage ("Academy") falsely certified compliance with HUD regulations, enabling it to obtain government insurance on mortgage loans underwritten by Academy and make claims on those loans. Academy now moves to transfer venue to the District of Utah under 28 U.S.C. § 1404(a). Docket No. 48 ("Transfer Mot."). Academy also moves to dismiss. Docket No. 50 ("Dismissal Mot."). For the reasons stated below, the Court **DENIES** both motions.

## I.     FACTUAL BACKGROUND

Relator alleges the following.

Academy is a lender. It participates in the Federal Housing Administration ("FHA") Direct Endorsement ("DE") program. Docket No. 45 ("FAC") ¶ 23. As a participant in the program, Academy is permitted to underwrite and endorse eligible residential mortgages for government insurance. *Id.* ¶ 20. In the event that the borrower defaults, the Department of Housing and Urban Development ("HUD") becomes liable for the loan. *Id.* ¶ 7.

Because DE lenders can endorse loans for insurance without prior government review, HUD relies on two lender certifications to ensure that only eligible loans with acceptable risk are

endorsed. *Id.* ¶¶ 146-50. The annual certifications are required in order to participate in the DE program; they certify that the lender complies with myriad laws and regulations. In addition, DE lenders must provide a loan-level certification for each loan endorsed for insurance.

The annual certifications are set forth in the FAC:

> 115. As of 2010, Academy annually certified:
>
> I [Academy] certify that I know, or am in the position to know, whether the operations of [Academy] conform[s] to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of [Academy]. I certify that [Academy] complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, [Academy] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [Academy] is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for [Academy] . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.
>
> 116. As of approximately August 1, 2016, a corporate officer of Academy was required to annually certify:
>
> I certify that I . . . have known, or have been in the position to know, whether the operations of [Academy] conformed to all HUD regulations and requirements necessary to maintain the Mortgagee's FHA approval as codified by 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by the Mortgagee Letter, and any agreements entered into between [Academy] and HUD.
>
> 117. Academy also certifies that it is responsible for the actions of its employees, including managers, supervisors, originators, underwriters and processors:
>
> I acknowledge that [Academy] is responsible for all actions of its officers, partners, directors, principals, managers, supervisors, loan processors, loan underwriters, loan originations, and other employees of [Academy], and for the actions of any Affiliates participating in the FHA programs for or on behalf of [Academy].
>
> 118. Currently, Academy is additionally required to certify:
>
> I certify that, to the best of my knowledge and after conducting a reasonable investigation, [Academy] does now, and did at all times throughout the Certification Period, comply with all HUD

2

> regulations and requirements necessary to maintain [Academy's] FHA approval as codified in 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by Mortgagee Letter, and any agreements entered into between [Academy] and HUD, except for those instances of non-compliance, if any, that [Academy] reported to HUD and for which [Academy] received explicit clearance from HUD to continue with the certification process. Each of my certifications is true and accurate to the best of my knowledge. I understand that if I have made any false, fictitious, or fraudulent statement(s), representation(s), or certification(s) knowingly on this form, I may be subject to administrative, civil and/or criminal sanctions, including damages, penalties, fines, imprisonment, and debarment under applicable federal law. I acknowledge that [Academy] is now, and was at all times throughout the Certification Period, subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964.

*Id.* ¶¶ 115-18.

There are two types of loan-level certifications. When Academy underwrites a loan, it can use HUD's electronic underwriting system called TOTAL to review the loan application. TOTAL processes loan information and rates loan as "accept/approve" or "refer/caution." For "accept/approve" loans endorsed for insurance, Academy certified:

> This mortgage was rated as an "accept" or "approve" by FHA's Total Mortgage Scorecard. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

*Id.* ¶ 137. For "refer/caution" loans, or where Academy does not use TOTAL, Academy certified:

> This mortgage was rated as a "refer" or "caution" by FHA's Total Mortgage Scorecard, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

*Id.* ¶ 138. HUD Handbook 4000.4 "includes . . . certifications that the mortgage complies with the

3

government's underwriting requirements contained in all outstanding Handbooks and Mortgagee Letters," *id.* ¶ 139, including certifications of the lender's due diligence and truthfulness and the borrower's ability to pay on the loan. *Id.* ¶ 140.

Starting from at least 2010 to 2017 when the FAC was filed, Academy contravened its certifications in various ways. For example, Academy paid commissions to underwriters based on the number of loans they approved, *see id.* ¶ 242, a practice prohibited by the HUD Handbook. *Id.* ¶ 240. Also, under a "management exception policy," Academy managers were empowered to and did direct underwriters to approve ineligible loans for FHA insurance over the underwriters' objections.[1] *Id.* ¶¶ 251-53; *see id.* 254-70 (providing examples). One way this manifested was in an "express, written policy" permitting Academy's sales employees to access electronic loan files to remove eligibility requirements which stood in the way of approval. *Id.* ¶¶ 271-87; *see id.* ¶¶ 288-307 (providing examples). The management exception policy also enabled managers to enter improper income and other calculations into ineligible loan files to enable the files to be approved for insurance. *Id.* ¶¶ 309-11; *see id.* ¶¶ 312-22, 350-79 (providing examples). These calculations deviated from the calculations required in the HUD Handbook. *See, e.g.*, *id.* ¶¶ 353-54 (prescribing income calculations regarding overtime and bonus income), 364, 367-70 (prescribing debt calculations).

Academy employees also gamed the TOTAL automated underwriting system to achieve "accept/approve" ratings and avoid "refer/caution" ratings (which require more documentation and manual underwriting to approve for insurance). *Id.* ¶¶ 323-27, 330. For instance, if a loan application resulted in a "refer/caution" rating, the employee would re-run the application while slightly varying input data until the system gave an "accept/approve" rating. *Id.* ¶¶ 339-40; *see id.* ¶¶ 343, 345-47 (providing examples). Employees would then tell the borrower the input

---

[1] The FAC extensively alleges that managers exerted improper pressure on underwriters to approve loans for insurance. FAC ¶¶ 194-238. However, it is unclear what regulation this violates. The FAC alleges that 24 C.F.R. § 203.5(c) required Academy to "exercise the same level of care . . . in obtaining and verifying information for a loan" as it would be for an uninsured loan, *id.* ¶ 184, but the FAC does not allege that Academy treated uninsured loans differently. The FAC also alleges that the HUD Handbook prohibits underwriters from being managed by those who perform origination (*i.e.*, sales staff), *id.* ¶ 187, but there is no allegation that the managers performed origination activities themselves.

4

parameters, thereby inviting the borrower to submit fraudulent documents that would achieve an "accept/approve" rating. *Id. ¶* 341. This practice is prohibited by the HUD Handbook. *Id.* ¶¶ 328-332.

Academy also directed employees to store adverse loan documents separately from the loan file. *Id.* ¶ 399. This permitted ineligible loans to be approved and prevented governments audits and internal quality controls from discovering the adverse documents. *Id.* ¶¶ 402-06. The practice violates FHA regulations. *Id.* ¶ 396.

Finally, when auditors identified discrepancies and violations of government requirements, Academy's management did not discipline employees or provide additional training to address these shortcomings. *Id.* ¶ 431.

According to the FAC, the above activities rendered Academy's annual and loan-level certifications false and caused HUD to insure loans it otherwise would not have. *Id.* ¶ 468, 479. In fact, Academy would not even have been permitted to participate in the DE program absent Academy's annual certification, and Academy was aware of this. *Id.* ¶ 466.

As a result of endorsing these ineligible loans, Academy was able to make claims against HUD. *Id.* ¶ 499. "From approximately May 1, 2010 to the present, there have been at least 17 claims for government insurance submitted by Academy." *Id.* ¶ 504. The FAC does not specify that these claims were for improperly endorsed loans. However, the FAC alleges that loans originated by Academy fall into serious delinquency or result in claims against the HUD at significantly higher rates than other lenders. *Id.* ¶ 508.

The FAC also alleges less prototypical claims. For example, the insurance premiums that Academy paid HUD assumed that insured loans were within acceptable risk limits. *Id.* ¶¶ 519, 521-22. In the absence of Academy's fraudulent certifications, HUD would have charged higher rates. *Id.* ¶ 520. Additionally, HUD would have incurred fewer administrative costs if it had not serviced and supported Academy's fraudulently insured loans. *Id.* ¶¶ 523-24.

## II.     MOTION TO TRANSFER VENUE

Academy seeks to transfer this case to Utah where it is headquartered. The court may "[f]or the convenience of the parties and witnesses [and] in the interest of justice" transfer "any

civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Courts apply a "two-step analysis" to determine whether a transfer of venue is appropriate. *Burgess v. HP, Inc.*, No. 16-cv-04784 LHK, 2017 U.S. Dist. LEXIS 15801, at *12 (N.D. Cal. Feb. 3, 2017). First, the court considers whether the case "could have been brought in the forum to which the moving party seeks to transfer the case." *Id.* (citing *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960)). If so, the court then has the discretion to consider whether the new venue is appropriate on an "individualized, case-by-case consideration of convenience and fairness." *Id.* at *13 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). "A motion for transfer lies within the broad discretion of the district court . . . ." *Sawyer v. Bill Me Later, Inc.*, No. 10-cv-04461 SJO, 2011 U.S. Dist. LEXIS 154784, at *7 (C.D. Cal. Oct. 21, 2011).

Neither party disputes that the case could have been brought in Utah. The FCA provides that "[a]ny action under [31 U.S.C. §3730] may be brought in any judicial district in which the defendant . . . resides, transacts business, or in which any act proscribed by [31 U.S.C. § 3729] occurred." 31 U.S.C. § 3732(a). Academy's principal place of business and its headquarters are in Draper, Utah. Transfer Mot. at 3. Therefore, jurisdiction and venue exist, and this case could have been properly brought in the District of Utah. Thus, the only issue is whether transfer would be convenient and fair.

A.  Standard

In determining convenience and fairness, courts consider the following factors:

> (1) plaintiff's choice of forum, (2) convenience of the parties, (3) convenience of the witnesses, (4) ease of access to the evidence, (5) familiarity of each forum with the applicable law, (6) feasibility of consolidation of other claims, (7) any local interest in the controversy, and (8) the relative court congestion and time of trial in each forum.

*Bozic v. Den Uijl*, No. 16-cv-733 BAS(MDD), 2017 WL 432878, at *4 (S.D. Cal. Jan. 31, 2017) (citing *Barnes & Noble v. LSI Corp.*, 823 F. Supp. 2d 980, 993 (N.D. Cal. 2011). The party seeking transfer bears the burden of showing that transfer is appropriate. *See Commodities Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979).

B.   Relator's Choice of Forum

Generally, a plaintiff's choice of forum should be given great deference. *See Adobe Sys. Inc. v. Bargain Software Shop, LLC*, No. C-14-3721 EMC, 2014 WL 6982515, at *3 (N.D. Cal. Dec. 8, 2014). However, "a plaintiff's choice of forum is *not* given substantial weight when the plaintiff is a *qui tam* relator, asserting the rights of the United States government." *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, No. C 99-3864 TEH, 2002 U.S. Dist. LEXIS 3321, at *11 (N.D. Cal. Feb. 25, 2002). Moreover, "[t]he degree to which courts defer to the plaintiff's chosen venue is substantially reduced where the plaintiff's venue choice is not its residence." *Fabus Corp. v. Asiana Express Corp.*, No. C-00-3172 PJH, 2001 U.S. Dist. LEXIS 2568, at *4 (N.D. Cal. Mar. 5, 2001). Relator is a *qui tam* plaintiff bringing suit on behalf of the U.S. government, and she does not work or reside in the district. Plaintiff resides in the Eastern District of California, adjacent to this district. Accordingly, her choice of forum is given some, but very limited, weight.

C.   Convenience of the Parties

Although Relator resides in the Eastern District of California and not in this district, the Northern District is much closer and therefore more convenient for her than the District of Utah. Of course, the District of Utah, being the location of Academy's headquarters, is more convenient for Defendant. However, transfer is not permitted where it merely shifts inconvenience from one party to another. *See Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). This factor is neutral.

D.   Convenience of the Witnesses

This factor turns primarily on the convenience of non-party witnesses and places particular focus on whether the court's subpoena power, more so than the convenience of party witnesses or witnesses employed by a party. "Courts give less consideration to the convenience of party witnesses or witnesses employed by a party because these witnesses can be compelled by the parties to testify regardless of where the litigation will occur." *Hendricks v. StarKist Co.*, 2014 WL 1245880, at *3 (N.D. Cal. Mar. 25, 2014). *See Sonoda v. Amerisave Mortg. Corp.*, No. C-11-1803-EMC, 2011 WL 2653565, at *6 (N.D. Cal. Jul. 6, 2011) (finding that the defendant will

likely be able to arrange to have its former and current employee testify at trial).

Under the FCA, courts appear to have nationwide subpoena power under 31 U.S.C. § 3731(a). That section provides: "A subpoena requiring the attendance of a witness at a trial or hearing conducted under section 3730 of this title [the False Claims Act] may be served at any place in the United States." 31 U.S.C. § 3731(a). "It does not appear that any circuit court of appeals has interpreted § 3731(a), but most district courts facing the issue have concluded that § 3731(a) empowers courts to compel witnesses to testify in any given federal judicial district." *United States ex rel. Brooks v. Stevens-Henager Coll., Inc.*, No. 1:13-cv-00009-BLW, 2015 U.S. Dist. LEXIS 22814, at *28 (D. Idaho Feb. 23, 2015) (collecting cases). *But see United States ex rel. Thomas v. Siemens AG*, No. 04-116, 2009 WL 1657429, at *2 (D.V.I. June 12, 2009) (holding that § 3731(a) provides only for service of subpoenas, not enforcement). In that event, the witnesses would be available to testify regardless of where they reside; potential problems with compelling witness testimony does not favor either forum.

Rather, the only residual concern is the convenience of potential witnesses. Relator has identified a number of non-party witnesses that she may call. They include borrowers from around the country, with many in California and none in Utah. *See* Docket No. 53-1. She also indicates that she may call HUD employees located in California. *See* Docket No. 53 ("Transfer Opp."), at 10. Academy, on the other hand, has identified no non-party witnesses, but it argues that its employees at its headquarters in Utah would be critical witnesses, as they are key to Academy's certification process, compliance, and quality control. This factor appears on balance to be neutral.

E.  Access to Evidence

Academy argues that this factor favors transfer, because much of the key evidence would be at its headquarters in Utah. Transfer Mot. at 8. However, "the fact that records are located in a particular district is not itself sufficient to support a motion for transfer." *Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272 EMC, 2010 WL 1445532, at *6 (N.D. Cal. Apr. 7, 2010). This is especially so in the era of documents being available electronically. Here, Academy indicates that its evidence is largely in electronic format. *See* Transfer Mot. at 8 ("Academy's corporate

8

1 records, computer systems, and electronic databases are stored and managed at the corporate office in Draper, Utah."). "[G]iven today's technological advancements, the ability to transfer electronic documents is generally not difficult or burdensome." *Benson*, 2010 WL 1445532, at *6. This factor is therefore neutral.

F. <u>Familiarity With the Law</u>

Relator argues that the FCA case law is more developed in the Ninth Circuit than in the Tenth Circuit, which contains Utah. For example, the Ninth Circuit has addressed the specific claim in the instant case: violation of the FCA for making false statements to procure home mortgage insurance from the HUD. *See United States v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008). Relator argues that neither the Tenth Circuit nor the District of Utah has issued similar opinions that would guide the resolution of the instant case. In addition, Relator argues that this district sees more FCA cases than the District of Utah. Defendant does not substantively respond to these points. Docket No. 57 ("Transfer Reply"), at 10. Instead, Academy argues that this factor is neutral because the FCA is a federal statute. Transfer Mot. at 8 (citing *S.F. Tech., Inc. v. Glad Prods. Co.*, 2010 U.S. Dist. LEXIS 83681, at *22 (N.D. Cal. July 19, 2010)).

Notwithstanding Relator's arguments, different district courts are presumptively equally capable of disposing of cases brought under federal law. *See Hawkes v. Hewlett-Packard Co.*, No. CV-10-5957-EJD, 2012 WL 506569, at *5 (N.D. Cal. Feb. 15, 2012) ("District courts are 'equally capable of applying federal law.'" (quoting *Allstar Mktg. Grp., LLC v. Your Store Online, Inc.*, 666 F. Supp. 2d 1109, 1133 (C.D. Cal. Aug. 10, 2009))); *Gomez v. Wells Fargo Bank, NA*, No. CV-09-00181-PHX-GMS, 2009 WL 1936790, at *5 (D. Ariz. July 2, 2009) (holding that these two district courts at issue were equally capable of deciding any federal law issues but that each district would be more capable of resolving state law issues of their respective states). *But cf. O.S. Sec. LLC v. Schlage Lock Co. LLC*, No. SACV 14-319 AG DFMX, 2014 WL 6766265, at *2 (C.D. Cal. Sept. 17, 2014) (holding that the court would have more expertise in patent cases than the proposed forum, because it participates in the Patent Pilot Program). This factor is therefore neutral.

9

G. <u>Feasibility of Consolidation of Other Claims</u>

There are no matters that might be consolidated with this one, and this factor is therefore neutral.

H. <u>Local Interest in the Controversy</u>

The District to Utah has a stronger interest in the controversy. Many more claims emanated from Utah than from this district between 2010 and 2016. *See* Docket No. 107, at 2. This fact favors transfer.

I. <u>Relative Court Congestion and Time of Trial</u>

The relative court congestion in this district compared to the District of Utah slightly favor transfer. *See* Transfer Mot. at 8-9 (citing official federal courts data).

J. <u>Conclusion</u>

While some considerations weigh in favor of transfer, the factors overall are largely neutral. The Court has already issued substantive ruling in the case. The parties and witnesses would not be significantly inconvenienced were venue of this case to remain here. There is no compelling or persuasive reason to transfer venue. In the exercise of discretion, the Court **DENIES** the motion to transfer venue.

### III.     MOTION TO DISMISS

A. <u>Legal Standard</u>

Relator alleges that Academy's actions described above violate 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). These provisions impose liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," respectively. Academy seeks dismissal of the FAC on the ground that it fails to allege the existence of materially false claims or Academy's scienter.

There are three types of "false or fraudulent claims." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1161, 1171 (9th Cir. 2006); *see also United States ex rel. Campie v. Gilead Sci., Inc.*, 862 F.3d 890, 900-02 (9th Cir. 2017). First, the claim for payment might itself be "literally false or fraudulent," "such as where a private company overcharges under a

government contract." *Hendow*, 461 F.3d at 1170. Second, the claim might be the result of "promissory fraud," where "the contract or extension of government benefit" under which the claim is submitted "was originally obtained through false statements or fraudulent conduct." *Id.* at 1173. Third, the claim might be the result of "false certification," where the payee "falsely certifies compliance with a statute or regulation as a condition to government payment." *Id.* at 1171.

False certification may be either express or implied. "Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." *United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). In contrast, under implied false certification, "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment." *Campie*, 862 F.3d at 901. In that case, a "fail[ure] to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement . . . renders the claim 'false and fraudulent.'" *Id.* at 901 (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016)). An implied certification claim must satisfy two conditions to succeed: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 136 S. Ct. at 2001.

Whether one proceeds "under the false certification theory or the promissory fraud theory, the essential elements of False Claims Act liability remain the same: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174. "We construe the Act broadly, as it is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Campie*, 862 F.3d at 899 (quoting *Hendow*, 461 F.3d at 1170).

"A claim under the False Claims Act must not only be plausible, but pled with particularity under Rule 9(b)." *Campie,* 862 F.3d at 898 (citations omitted). "To satisfy Rule 9(b), a pleading

11

must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *United States ex rel. Cafasso v. Gen. Dynamic Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (alteration in original) (quoting *Ebeid*, 616 F.3d at 998). The allegations "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *United States ex rel. Silingo v. WellPoint, Inc.*, 895 F.3d 619, 628 (9th Cir. 2018) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). The scienter requirement, however, may be pleaded generally. *Id.* at 631.

B.  Literally False and False Certification

The "literally false" theory undisputedly does not apply. Express false certification also does not apply. Under that theory, the untrue certification must be submitted "as part of the process through which the claim for payment is submitted." *Ebeid*, 616 F.3d at 998. There is no allegation, however, that any certification is submitted during the claim process here. Rather, the last certification alleged is the loan-level certification, which is submitted during the endorsement process.

Whether implied false certification applies here is unclear. *Escobar* indicates that an implied false certification is only actionable if the claim "makes specific representations about the goods or services provided" but omits information about noncompliance so as to render the representations "misleading half-truths." *Escobar*, 135 S. Ct. at 2001; *accord Campie*, 862 F.3d at 901. The FAC does not satisfy that requirement, as it fails to allege that Academy's claims made any specific representations. However, the cases regarding implied false certification, including *Escobar*, *Campie*, and *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332 (9th Cir. 2017), have not addressed the situation where a false statement is made before a claim is filed. And the latest word from the Ninth Circuit, albeit dicta, suggests a broader understanding of implied false certification than *Escobar* and *Campie* indicate at first glance. *See Silingo*, 895 F.3d at 627. It may be that implied false certification extends to such cases. However, the Court does not decide this issue, because the promissory fraud theory applies to the instant case.

C. Promissory Fraud

Under this "somewhat broader" theory, "subsequent claims are false because of an *original fraud*," which may include "a certification or otherwise." *Hendow*, 461 F.3d at 1173. This permits "liability [to] attach to each claim submitted to the government under a contract, when the contract or extension of the government benefit was originally obtained through false statements or fraudulent conduct." *Campie*, 862 F.3d at 902 (quoting *Hendow*, 461 F.3d at 1173). Here, the original fraud can be found in either the annual certification or a loan-level certification. If a loan-level certification is fraudulent, *e.g.*, because it was improperly underwritten or endorsed, then any claim made on that loan would be a false claim under the promissory fraud theory. If the annual certification is the original fraud, however, and that fraud is cognizable under the promissory fraud theory, the impact of that certification is much wider. Because Academy's participation in the DE program for a particular year is premised on the annual certification, every loan endorsement under the DE program would be a fraudulently obtained "contract or extension of . . . government benefit"—including those individual loans that were otherwise properly underwritten and endorsed. *Id.* In that case, "each claim" on a loan endorsed in the year of the fraudulent annual certification would be tainted and constitute a false claim.[2]

Regardless of whether one proceeds under promissory fraud or false certification, the elements to be proven remain the same: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174.

1. False Claims

First, Academy argues that the FAC does not identify any "claims" within the meaning of the Act and certainly none that satisfy Rule 9(b). Mot. at 8. It points out that though Relator alleges "at least 17 claims for government insurance" between 2010 and the FAC filing date, the FAC provides no identifying details about these loans. Mot. at 8-9 (quoting FAC ¶ 504).

---

[2] Academy complains that the Relator raises promissory fraud for the first time in her Opposition, Reply at 3. However, the FAC is sufficiently clear without uttering the words "promissory fraud": it alleges that Academy filed false annual and loan-level certifications, enabling it to endorse loans and make claims against HUD.

13

However, Rule 9(b) does not require relators "to identify representative examples of false claims." *Ebeid*, 616 F.3d at 998. "[U]se of representative examples is simply one means of meeting the pleading obligation." *Id.* To satisfy Rule 9(b), "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* at 998-99 (quoting *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

Academy is correct that Relator has failed to identify representative examples of false claims. She alleges that Academy submitted 17 claims between 2010 and 2017 when the FAC was filed. But even putting aside the lack of identifying details, Relator does not allege that these 17 claims are false claims, *i.e.*, that the 17 respective loans were endorsed under a fraudulent annual certification or loan-level certification. The false certifications ran from "at least 2010" to 2017. FAC ¶ 168. But the 17 respective loans could have been endorsed prior to 2010 under a non-fraudulent annual certification, and there is no allegation that they were endorsed under a false loan-level certification. Thus, there is no indication that the claims resulting from these loans were false claims.[3]

Nevertheless, Relator has stated false claims in connection with the annual certifications. In Nicole Abraham's declaration in support of Academy's motion to transfer venue, she states that 10 loans originated in 2015 to 2017 resulted in claims on FHA insurance. Docket No. 49 ¶ 16. Because this falls within the 2010-to-2017 period during which Academy allegedly operated under false annual certifications, these loans qualify as false claims. Although Academy argues that these 10 claims are not false claims because the FAC does not connect the improper underwriting to any of the 10 underlying loans, *see* Docket No. 111 (Hearing Transcript), at 41-42, Academy mistakenly focuses only on the loan-level certification and fails to account for the false annual certifications that taint every loan insured in the respective year and every claim on such loans.[4]

---

[3] Academy also correctly points out that, while the FAC alleges 2 loans that entered foreclosure and 10 loans that were improperly underwritten, the FAC fails to allege that claims were made on these loans. *See* Mot. at 9.

[4] While the complaint is not sufficiently specific to state false claims based on loan-level certifications, the motion to dismiss is denied for the reasons stated above, and Relator is

14

Moreover, Relator has identified "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-99 (quoting *Grubbs*, 565 F.3d at 190). Academy has conceded that claims were actually submitted, and Relator has alleged "particular details of a scheme" by way of her thorough allegations of wrongdoing, much of it first-hand. *See Silingo*, 895 F.3d at 630 (a scheme is properly alleged where the relator alleges "first-hand experience of the scheme unfolding").

Academy makes two other arguments. First, it argues that there is no indication that Academy made false statements in the claim forms themselves. *See* Mot. at 9-11. It argues that such statements are required by *Escobar*, which required that the claim "make[] a specific representation about the goods or services provided" that was then rendered misleading by omission of noncompliance. 136 S. Ct. at 2000-01. But as discussed above, *Escobar* only addressed the implied certification theory. Under the promissory fraud theory, a claim is false if it is based on a contract or other government benefit obtained through false statements. In that case, the false statement is made during the contracting process, not the claim process.

Second, Academy contends that Relator fails to identify the false statement with specificity, writing that she "does not identify any specific certification containing a false or fraudulent statement, nor any individual at Academy who made such a statement, much less when and where it was made." Mot. at 12. This disregards Relator's allegations of the exact language of the certifications and her allegations that the annual certifications were approved by Academy annually from 2010 to 2017 and that the loan-level certifications were approved every time a loan was endorsed. *See* FAC ¶¶ 115-18, 127, 137-38. Relator has given specific examples why these certifications were in fact false. *See id.* ¶¶ 437-44, 448-453.

Relator has sufficiently alleged false claims under Rule 9(b).

2. Materiality

Academy also argues that Relator failed to meet the materiality requirement of an FCA claim. As previously discussed, FCA liability requires that the false statement must have been a

---

permitted to take discovery on loan-level certifications and may assert those as bases for false claims if the evidence so proves.

15

material cause of the Government's decision to pay out funds. *See Hendow*, 461 F.3d at 1174.

"Under the False Claims Act, a falsehood is material if it has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *Campie*, 862 F.3d at 904-05 (quoting 31 U.S.C. § 3729(b)(4)). "[T]he materiality standard is demanding." *Id.* at 905 (quoting *Escobar*, 136 S. Ct. at 2003). Where the false claim is based on a false certification of compliance with regulations, materiality is not satisfied by "minor or insubstantial" violations. *Id.* (quoting *Escobar*, 136 S. Ct. at 2003). "[R]ather, the false claim or statement must be the '*sine qua non* of receipt of state funding.'" *Campie*, 862 F.3d at 899 (quoting *Ebeid*, 616 F.3d at 997). The key to the inquiry is "the likely or actual" effect the misrepresentation has on "the recipient of the alleged misrepresentation" and how that affects the payment decision. *Escobar*, 136 S. Ct. at 2002 (quoting 26 R. Lord, Williston on Contracts § 69:12 (4th ed. 2003)). Relevant but non-determinative, non-exhaustive factors include: whether the Government has designated compliance with a regulation as a condition of payment and whether the Government pays in typical cases of noncompliance. *See Escobar*, 136 S. Ct. at 2003-04.

Academy argues that its noncompliance with applicable regulations was not material to HUD's payment decision, because "HUD is statutorily-mandated to pay any claims submitted on" FHA-insured loans. Mot. at 15. Because HUD could not have refused to pay claims even "had it known of Academy's alleged noncompliance," Academy's noncompliance did not have an effect on the payment decision. Mot. at 15. In effect, Academy asks the Court to apply the materiality requirement narrowly to the payment decision only and not to the causal chain leading to that payment decision.

Academy's reasoning defies the thrust of the promissory fraud theory and would effectively negate it. Unsurprisingly, the courts have rejected Academy's proposition. In *Escobar*, the Supreme Court rejected the notion that noncompliance with a regulation should be material only where the Government has expressly designated compliance as a condition of payment. *See Escobar*, 136 S. Ct. at 2002. The Court wrote that this would create "arbitrariness," because "under this theory, misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim would not [incur liability]." *Id.* The

16

Court therefore clearly contemplated that FCA liability could lie based on noncompliance with conditions on participation in a federal program, *e.g.*, the DE program. Thus, if a false annual certification is material to Academy's permission to participate in the DE program, it is material to HUD's decision to pay out money on loans insured under that program. *Cf. Campie*, 862 F.3d at 906 (Drug manufacturer fraudulently obtained FDA approval for certain drugs, then sought reimbursement based on that approval. Materiality was satisfied despite FDA approval, in part because manufacturer should not be "allow[ed] . . . to use the allegedly fraudulently-obtained FDA approval as a shield against liability for fraud.").

Here, the false annual and loan-level certifications were material to HUD's payment of claims. Academy's participation in the DE program and therefore its ability to endorse loans and make claims on them was conditioned on Academy's annual certification. FAC ¶ 466. Likewise, a loan-level certification was required for individual loans to be endorsed. *Id.* ¶ 474. In addition, the violated regulations are material to HUD's decision to insure the loans, because the regulations are necessary to shield the Government from undue financial risk and protect the viability of the DE program. *See id.* ¶¶ 66, 106, 126. As Relator notes, the fact that HUD is required to pay claims on FHA-insured loans underscores the fact that "[t]he entire FHA program hinges upon lenders complying with the applicable . . . requirements" "to ensure that HUD only guarantees loans within an acceptable amount of risk." Docket No. 54 ("Opp.") at 16; *see United States v. Quicken Loans Inc.*, 239 F. Supp. 3d 1014, 1040 (E.D. Mich. 2017) (holding that DE program requirements are material because "they go to the essence of the bargain between HUD and Quicken").

Here the alleged violations which contravene Academy's certifications are far from trivial. Violations such as overriding endorsement conditions, manipulating the data to get an otherwise unqualified loan to qualify, hiding adverse documentation, and incentivizing underwriters to facilitate the making of bad loans through payment of commission go to the heart of the DE lender's duty to the Government under the program. It is highly plausible that HUD would not have continued to insure Academy's loans if Academy had been forthright about these violations instead of falsely certifying its compliance with HUD regulations. Academy's argument that the

17

FAC alleges only "technical violations" of HUD requirements is baseless. Mot. at 16; Docket No. 58 ("Reply"), at 4 (characterizing the violated regulations as "one of HUD's thousands").

Academy also argues that Relator failed to point out instances in which HUD declined to pay claims for regulatory violations. Mot. at 16. However, the Government's declination to pay claims would be only one non-determinative indication of materiality. As Relator rightly points out, the Government has in fact pursued FCA actions against other lenders engaged in similar practices. *See* Opp. at 17 (collecting cases). Obviously, the Government considers such misrepresentation material.

    3.    <u>Scienter</u>

Academy also challenges the FAC's ability to satisfy the scienter requirement. Scienter requires an allegation "that a defendant knew a claim for payment was false, or that it acted with reckless disregard or deliberate indifference as to the truth or falsity of the claim." *Silingo*, 895 F.3d at 631 (citing *United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011)). "Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally," provided the allegation is plausible. *Id.* (citing Fed. R. Civ. P. 9(b)). In addition, the defendant must know that the violated requirement "is material to the Government's payment decision." *Escobar*, 136 S. Ct. at 1996.

Academy argues that there is no allegation of a knowing or reckless violation of any FHA requirement. For example, there are no allegations of training or encouragement in support of submitting ineligible claims for FHA insurance. Mot. at 21. However, the FAC alleges that Academy created a management exception policy to permit managers to override FHA requirements over the protestations of underwriters. It alleges also that Academy employees hid adverse loan documents. These clear instances of deliberate misbehavior cannot be chalked up to mere negligence.

Academy also argues that the FAC only conclusorily alleges that Academy knew the HUD requirements were material. Mot. at 22 (citing FAC ¶ 527). But the FAC alleges that certification of compliance with the requirements was necessary to join the DE program and submit loans for insurance. Since Academy did in fact certify compliance and join the program, it presumably (and

therefore plausibly) knew that certification and compliance were necessary and therefore material to its ability to endorse loans and make claims on them.

Academy also argues that an FCA claim proceeding under the theory of promissory fraud requires the false statement at issue be an "intentional, palpable lie" and that reckless disregard of the statement's falsity was insufficient. Reply at 6 (quoting *Hopper*, 91 F.3d at 1267). The allegations are sufficient to meet this standard, but in any case Academy misconstrues *Hopper*'s holding. *Hopper* did hold that "[f]or a certified statement to be 'false' under the Act, it must be an intentional, palpable lie." 91 F.3d at 1267. *Hopper* concerned a school district that allegedly falsely certified that it complied with special education regulations in order to receive federal funds under the Individuals with Disabilities Education Act. In *Hopper*, the record on summary judgment was "devoid" of any indication that the district knew it was violating the regulations. *Id.* In fact, the record showed that the district has a policy of complying with regulations and curing any deficiencies that surface. *See id. Hopper*'s holding contrasted "intentional, palpable lie[s]" with "innocent mistakes, mere negligent misrepresentations and differences in interpretations [which] are not false certifications under the Act." *Id.* It did not hold that reckless disregard was insufficient to satisfy scienter, and the Ninth Circuit later confirmed that reckless disregard in fact sufficed. *See Silingo*, 895 F.3d at 631; *see also* 31 U.S.C. § 3729(b)(1) (defining "knowingly" to include "reckless disregard of the truth or falsity of the information"). Academy's argument that scienter under promissory fraud has a higher standard than under false certification is unsupported and unpersuasive.

In sum, neither Academy's arguments regarding scienter nor materiality are persuasive.

D. Conclusion

For the reasons above, Academy's motion to dismiss is **DENIED**.

///
///
///
///
///

19

## IV. CONCLUSION

For the reasons stated above, the motion to transfer and motion to dismiss are **DENIED**.

This order disposes of Docket Nos. 48 and 50.

**IT IS SO ORDERED**.

Dated: August 24, 2018

EDWARD M. CHEN
United States District Judge